# 24-1045

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 24-1045

◄►◄►◄►

AMERICAN GREENFUELS ROCKWOOD (TENNESSEE),
LLC, a Delaware limited liability company,

*Plaintiff-Counter-Defendant-Appellee*,

KOLMAR AMERICAS, INC.,

*Counter-Defendant-Appellee*,

—v.—

AIK CHUAN CONSTRUCTION PTE. LTD.,
a Singapore registered company,

*Defendant-Counter-Claimant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF APPELLANT & SPECIAL APPENDIX

Melissa Brown
ARNOLD & PORTER
  KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000

John F. Hagan, Jr.
Mark J. Samartino
ARNOLD & PORTER
  KAYE SCHOLER LLP
70 West Madison, Suite 4200
Chicago, IL 60602
(312) 583-2300
john.hagan@arnoldporter.com

*Counsel for Appellant Aik Chuan Construction Pte. Ltd.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant Aik Chuan Construction Pte. Ltd., by and through its undersigned counsel, certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ....................................................... i

TABLE OF CONTENTS ..................................................................................... ii

TABLE OF AUTHORITIES ............................................................................... iv

INTRODUCTION ................................................................................................1

JURISDICTIONAL STATEMENT .....................................................................3

STATEMENT OF THE ISSUES..........................................................................4

STATEMENT OF THE CASE .............................................................................5

I.  FACTUAL BACKGROUND.....................................................................5

II. PROCEDURAL HISTORY .....................................................................10

SUMMARY OF ARGUMENT ..........................................................................11

STANDARD OF REVIEW ................................................................................13

ARGUMENT ......................................................................................................14

I.  THE DISTRICT COURT ERRED IN HOLDING THAT THERE WAS
    AN EVENT OF DEFAULT .....................................................................14

    A.  AGF Never Conducted the Required "Verification Test" and
        Kolmar Unequivocally Waived The Verification Target Date ..........15

        1.  AGF never conducted a Verification Test .................................15

        2.  AGF waived the contractual target deadline.............................17

    B.  The District Court Incorrectly Held That Aik Chuan Waived All
        Defenses To Breach Of The Subordination Agreement ....................20

II. THE DISTRICT COURT ERRED BY FAILING TO ANALYZE
    WHETHER THE FORECLOSURE SALE WAS COMMERCIALLY
    REASONABLE UNDER ARTICLE 9 OF THE U.C.C..............................22

A. The Foreclosure Sale Had To Be Conducted In Accordance with the U.C.C. ................................................................................23

B. The Foreclosure Sale Was Plainly Commercially Unreasonable Under The U.C.C. ...............................................................................25

III. THE DISTRICT COURT MISAPPLIED TENNESSEE REAL PROPERTY LAW .......................................................................34

A. The Court Erred In Applying Rebuttable Presumption Of Fair Market Value By Ignoring That There Was Evidence of Fraud, Irregularities, Or Collusion ....................................................................34

B. The District Court Did Not Analyze Whether The Plant Sold For A Price Materially Less Than The Fair Market Value ..........................36

C. The Foreclosure Amount Was Not Fair Market Value .......................39

1. The Foreclosure Sale Was Not An Arm's Length Transaction 40

2. The District Court Misapplied Governing "Going Concern" Caselaw To The Undisputed Facts Established At Trial ..........42

IV. THE DISTRICT COURT ERRED BY AWARDING AGF DAMAGES THAT INCLUDED UNRECOVERABLE INTEREST ...............................49

A. The Court's Interest Calculations Ignore That The Subordination Agreement Has No Interest Provision...................................................49

B. The Court Improperly Applied The Loan Agreement's Interest Provisions To The Kicker Fee............................................................52

CONCLUSION .......................................................................................................59

CERTIFICATE OF COMPLIANCE.......................................................................60

CERTIFICATE OF SERVICE ................................................................................61

SPECIAL APPENDIX.............................................................................................62

SPECIAL APPENDIX INDEX ............................................................................ SAi

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Comms. Corp.*,
    512 B.R. 447 (Bankr. S.D.N.Y. 2014) ............................................... 43

*Am. Railcar Indus., Inc. v. GyanSys, Inc.*,
    No. 14-CV-8533, 2017 WL 11501888 (S.D.N.Y. Nov. 14, 2017) ............. 18, 20

*BancAmerica Priv. Brands, Inc. v. Marine Gallery, Inc.*,
    550 N.Y.S.2d 720 (2d Dep't 1990) ..................................................... 25

*Boyce v. Soundview Tech. Group, Inc.*,
    464 F.3d 376 (2d Cir. 2006) ............................................ 49, 50, 51, 52

*Brown v. City of New York*,
    862 F.3d 182 (2d Cir. 2017) ............................................................. 54

*Cap. Bank v. Brock*,
    No. E2013-01140-COA-R3CV, 2014 WL 2993844 (Tenn. Ct.
    App. June 30, 2014) ....................................................................... 36

*CCO Condo Portfolio (AZ) Junior Mezzanine, LLC v. Feldman*,
    21-CV-2508, 2024 WL 622098 (S.D.N.Y. Feb. 14, 2024) ................... 30

*Cent. Budget Corp. v. Garrett*,
    368 N.Y.S.2d 268 (2d Dep't 1975) ............................................... 27, 33

*Citibank, N.A. v. Brigade Cap. Mgmt., LP*,
    49 F.4th 42 (2d Cir. 2022) ........................................................... 13, 14

*Coxall v. Clover Com. Corp.*,
    781 N.Y.S.2d 567 (N.Y. Civ. Ct. 2004) ......................................... 26, 27

*Cullum & Maxey Camping Ctr., Inc. v. Adams*,
    640 S.W.2d 22 (Tenn. Ct. App. 1982) ............................................... 25

*Cutshaw v. Hensley*,
    2015 WL 4557490 (Tenn. Ct. App. July 29, 2015) ......................... 37, 39

iv

*DiStefano v. Maclay*,
  102 F. App'x 188 (2d Cir. 2004) ........................................................20

*Eastman Credit Union v. Bennett*,
  No. E201501339COAR3CV, 2016 WL 1276275 (Tenn. Ct. App.
  Mar. 31, 2016) .................................................................................37

*First Interstate Credit All., Inc. v. Clark*,
  No. 89-CV-3263, 1989 WL 149078 (S.D.N.Y. Dec. 4, 1989) ...........29

*In re Four Star Music Co.*,
  2. B.R. 454 (Bankr. M.D. Tenn. 1979) .......................................30, 33

*Garra v. Metro-N. Commuter R.R.*,
  No. 17-CV-1293, 2021 WL 1536499 (S.D.N.Y. Feb. 12, 2021) ......18

*Gen. Elec. Credit Corp. v. Durante Bros & Sons, Inc.*,
  433 N.Y.S.2d 574 (1st Dep't 1980) ............................................30, 31

*Granite Partners v. Merill Lynch, Pierce, Fenner & Smith Inc.*,
  No. 96-CV-7874, 2002 WL 975606 (S.D.N.Y. May 10, 2002) ..........26, 30

*Hartigan v. Brush*,
  2021 WL 4983075 (Tenn. Ct. App. Oct. 27, 2021) ..........................40

*Indu Craft, Inc. v. Bank of Baroda*,
  47 F.3d 490 (2d Cir. 1995) .....................................................49, 51, 52

*In re Iridium Operating LLC*,
  373 B.R. 283 (Bankr. S.D.N.Y. 2007) ...............................................48

*Kreisler v. Second Ave. Diner Corp.*,
  731 F.3d 184 (2d Cir. 2013) .............................................................13

*Liberty Nat'l Bank & Tr. Co. of Oklahoma City v. Acme Tool Div. of
  Rucker Co.*,
  540 F.2d 1375 (10th Cir. 1976) .......................................................32

*Mallincoat v. Volunteer Finance & Loan Corp.*,
  415 S.W.2d 347 (Tenn. Ct. App. 1966) ...........................................26

*In re Matter of Newmark*,
  20 B.R. 842 (Bankr. E.D.N.Y. 1982) ...............................................41

*McIllwain v. Hoover*,
   No. M2013-01277-COA-R3CV, 2014 WL 2155348 (Tenn. Ct.
   App. May 19, 2014) ................................................................42

*Moreno-Godoy v. Kartagener*,
   7 F.4th 78 (2d Cir. 2021) ..............................................49, 50, 51, 52

*Oscar Gruss & Son, Inc. v. Hollander*,
   337 F.3d 186 (2d Cir. 2003) ...................................................14

*Ostano Commerzanstalt v. Telewide Systems, Inc.*,
   794 F.2d 763 (2d Cir. 1986) ...........................................51, 52

*Patriarch Partners XV, LLC v. U.S. Bank Nat'l Ass'n*,
   No. 16-cv-7128, 2017 WL 3822603 (S.D.N.Y. Aug. 28, 2017) .......................26

*Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
   51 F.4th 456 (2d Cir. 2022) ...................................................22

*Process Am., Inc. v. Cynergy Holdings, LLC*,
   839 F.3d 125 (2d Cir. 2016) ...................................................14

*Protoons Inc. v. Reach Music Publ'g, Inc.*,
   No. 09-CV-5580, 2016 WL 680543 (S.D.N.Y. Feb. 19, 2016) .......................22

*Questrom v. Federated Dep't Stores*,
   2 F. App'x 81 (2d Cir. 2001) ...................................................48

*Questrom v. Federated Dep't Stores*,
   84 F. Supp.2d 483 (S.D.N.Y. 2000) ...................................................48

*Regions Bank v. Thomas*,
   532 S.W.3d 330 (Tenn. 2017) .....................................................27

*Schonfeld v. Hilliard*,
   218 F.3d 164 (2d Cir. 2000) ...........................................40, 42

*Seiden Assocs., Inc. v. ANC Holdings, Inc.*,
   959 F.2d 425 (2d Cir. 1992) ...................................................16

*Simon v. Electrospace Corp.*,
   269 N.E.2d 21 (N.Y. 1971)...................................................49

*Smith v. Daniels*,
    634 S.W.2d 276 (Tenn. Ct. App. 1982) ............................................................... 31

*State v. Lyons*,
    669 S.W.3d 775 (Tenn. 2023) ............................................................................. 40

*Town & Country*, Linen Corp. v. Ingenious Designs LLC,
    No. 18-CV-5075, 2022 WL 2757643 (S.D.N.Y. July 14, 2022) ................ 51, 52

*In re TransCare Corp.*,
    81 F.4th 37 (2d Cir. 2023) ........................................... 41, 42, 43, 45, 46

*In re TransCare Corp.*,
    No. 20-CV-06274, 2021 WL 4459733 (S.D.N.Y. Sept. 29, 2021) .................... 41

*U.S. Bank Nat'l Ass'n v. Vill. At Lakeridge, LLC*,
    583 U.S. 387 (2018) ..................................................................................... 40, 41

*U.S. v. Conrad Pub Co.*,
    589 F.2d 949 (8th Cir. 1978) ........................................................................ 29, 32

*U.S. v. Terrey*
    554 F.2d 685 (5th Cir. 1977) ............................................................................. 29

*United States v. Jordan*,
    591 F. Supp. 2d 686 (S.D.N.Y. 2008) ............................................................... 56

*Wallace v. Suffolk Cnty. Police Dep't*,
    809 F. Supp. 2d 73 (E.D.N.Y. 2011) ................................................................. 56

*Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*,
    946 F.2d 1003 (2d Cir. 1991) ............................................................................ 14

*In re Zsa Zsa Ltd.*,
    352 F. Supp. 665 (S.D.N.Y. 1972) ............................................................... 27, 31

*In re Zsa Zsa Ltd.*,
    475 F.2d 1393 (2d. Cir. 1973) .......................................................................... 27

**Statutes**

28 U.S.C.
  § 1291 ..............................................................................4
  § 1332 ..............................................................................3

N.Y. U.C.C.
  § 9-604(a) ........................................................................24
  § 9-604(b) ........................................................................24
  § 9-610(b) ..................................................................12, 25
  § 9-615 ............................................................................27
  § 9-615(d) ........................................................................34
  § 9-615(e) ........................................................................34
  § 9-615(f) ...................................................................27, 34
  § 9-626(a)(3) .......................................................23, 26, 33
  § 9-627 ............................................................................27
  § 9-627(b)(3) ......................................................26, 30, 32

Tenn. Code Ann.
  § 35-5-117 ......................................................................35
  § 35-5-117(a) ..................................................................35
  § 35-5-117(b) ..................................................................35
  § 35-5-117(c) .............................................................35, 37
  § 35-5-118 ......................................................................35
  § 47-9-604(a) ..................................................................24
  § 47-9-604(b) ..................................................................24
  § 47-9-610(b) ..................................................................25
  § 47-9-615(d) ..................................................................34
  § 47-9-615(e) ..................................................................34
  § 47-9-615(f) .............................................................27, 34
  § 47-9-626(3) .......................................................23, 26, 33
  § 47-9-627 ......................................................................27
  § 47-9-627(b)(3) ..................................................26, 30, 32

**Rules**

N.Y. C.P.L.R. § 5001(a) ........................................................50

N.Y. C.P.L.R. § 5004(a) ........................................................50

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ........................................40, 42

## INTRODUCTION

The final judgment the District Court entered below in favor of American GreenFuels (Rockwood) Tennessee, LLC ("AGF") and Kolmar Americas, Inc. ("Kolmar")[1] both sanctioned and rewarded an unlawful and bad faith scheme to seize a renewable diesel plant in Rockwood, Tennessee owned by Global Energy[2] (the "Rockwood Plant") for less than two percent of its fair market value. The plant's rightful owner was Global Energy who purchased the plant from Aik Chuan Construction Pte. Ltd. ("Aik Chuan") in 2020 for $85 million plus a 5% equity warrant in Global Energy, with nearly all the purchase price financed through promissory notes issued by Aik Chuan, which Global Energy would pay down once the plant began generating revenue.

At the same time, Global Energy borrowed $7.95 million from AGF, a commodities trader that markets renewable fuels. AGF's loan was secured by all of

---

[1] Because each relevant AGF party witness in this case had a job title at Kolmar, Aik Chuan uses the party names "AGF" and "Kolmar" interchangeably, except where distinguishing between the two entities is material to a specific document that only one of the corporate entities signed (such as the Loan Agreement) or where their separateness is relevant to Aik Chuan's theory of liability and/or recoverable remedies (e.g., Kolmar is potentially liable for tortious interference, but not breach of contract because Kolmar has no contractual relationship with Aik Chuan).

[2] "Global Energy" collectively refers to the Global Energy entities that purchased the Rockwood Plant from Aik Chuan and were a part of the Loan Agreement with AGF.

the plant's assets, including the ground-breaking technology and manufacturing process that transforms inexpensive wood chips into highly sought after renewable diesel. Aik Chuan helped facilitate AGF's loan by subordinating its promissory notes to AGF's loan and by guaranteeing to pay Global Energy's debt if Global Energy committed an event of default.

AGF recognized from the beginning that its modest loan was vastly over secured because AGF had forecasted and projected that the plant would generate *hundreds of millions* of dollars in EBITDA per year. Barely a year after the Global Energy transaction closed, AGF devised and executed a three-step plan to capture all of the plant's value for itself. *First*, AGF declared fictious events of default (each an "Event of Default") under its loan agreement with Global Energy (the "Loan Agreement") to force the plant into foreclosure. *Second*, AGF purposefully did not market the plant to potential investors or anyone in the oil and gas industry. Finally, AGF issued an intentionally misleading foreclosure notice that: (a) ran exclusively in a local newspaper; and (b) did not disclose the existence of a plant or machinery on the property.

AGF's sham foreclosure process worked as intended: AGF was the only bidder at the foreclosure sale and AGF acquired the plant for just $1.7 million or 98% less than it had sold for the year before. That sale effectively rendered Aik Chuan's promissory notes and equity warrant rights worthless. But not content with

2

acquiring a renewable diesel plant for pennies on the dollar, AGF filed suit against Aik Chuan to recoup approximately $19 million for the purported "shortfall" between Global Energy's outstanding debt and the plant's below market value foreclosure sale price.

The District Court's principal findings that: (1) AGF's foreclosure scheme here complied with the law; (2) the $1.7 million foreclosure sale price represented the plant's fair market value; and (3) AGF was entitled to tens of millions of dollars in damages from Aik Chuan are erroneous and cannot be reconciled with the parties' governing agreements, the rigorous "commercially reasonable" sale requirements imposed by Article 9 of the Uniform Commercial Code ("U.C.C."), or this Circuit's precedent. Those findings are also not supported by the evidence admitted at trial. This Court should therefore vacate the judgment below and remand for further proceedings in the District Court.

## JURISDICTIONAL STATEMENT

Federal subject matter jurisdiction exists under 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs. Aik Chuan appeals from (1) the District Court opinion and orders entered on November 20, 2023 (JA185-245); (2) the District Court memorandum opinion and orders entered on December 4, 2023 (JA246-52); (3) the final judgment entered on December 5, 2023 (JA253-54); and

(4) the denial of Aik Chuan's Motion to Alter or Amend the Judgment Pursuant to Rule 59(e) as detailed in the District Court's opinion and order entered on March 20, 2024 (JA773-81). Aik Chuan filed a notice of appeal on April 18, 2024. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 because Aik Chuan is appealing from a final judgment.

## STATEMENT OF THE ISSUES

1. Aik Chuan guaranteed Global Energy's loan from AGF to build out the Rockwood Plant, but only if there was an Event of Default under the Loan Agreement. AGF declared Global Energy in default due to the plant's alleged insufficient fuel production, but AGF never conducted the contractually mandated "verification testing" the parties agreed would determine if the plant was meeting expectations. Did the District Court err in finding that Global Energy defaulted under the Loan Agreement?

2. AGF noticed its foreclosure sale of the plant as not just a foreclosure sale, but also a "U.C.C. Sale." That notice appeared exclusively in a local county newspaper, listed only the plant's geographical coordinates, and did not disclose that there was a diesel plant there or describe any of the machinery for sale. Did the District Court err by not analyzing whether the foreclosure sale was commercially reasonable under Article 9 of the U.C.C. and/or by concluding that the sale complied with Tennessee real estate law?

3.  This Circuit's definition of a going concern business is forward looking: the expectation of continued operations with future earning power.  At trial, witnesses uniformly testified—based on financial projections compiled both before and after the foreclosure sale—that the Rockwood Plant should not only generate future revenue, but also significant profits.  Did the District Court err by concluding that the plant could not be valued as a going concern?

4.  AGF's only claim here is that Aik Chuan breached the Subordination Agreement, which does not contain any interest provision for unpaid sums.  Only the separate Global Energy / AGF Loan Agreement provides for interest and only as to loan principal, not other fees.  Did the District Court err by awarding AGF contract-based interest or, at a minimum, by awarding millions of dollars in interest on a "kicker fee" that is not defined as principal under the Loan Agreement?

## STATEMENT OF THE CASE

## I.    FACTUAL BACKGROUND

This is a case about the Rockwood Plant, a renewable diesel plant in Rockwood, Tennessee designed to produce diesel through the burning of waste wood and utilizing a technology called wood pyrolysis.  In March 2020, Aik Chuan sold the Rockwood Plant to Global Energy for $85 million and a 5% equity warrant in Global Energy with an initial payment of $250,000 and the balance financed

through two promissory notes, one for approximately $40 million, and the other for approximately $45 million. JA3227.

As part of that transaction, Global Energy also entered into a Loan Agreement with AGF, a wholly owned subsidiary of Kolmar, for a $7.95 million loan. JA3228. The Loan Agreement also contained a kicker fee, which equated to 70% of the principal amount of the loan. *Id*. Global Energy sought the loan to build out the plant and produce enough renewable diesel in a continuous, 30-day period to pass the Verification Test described in detail in the Loan Agreement. *Id*. May 31, 2021 was the contractual Target Verification Date for completion of a successful Verification Test. JA3239; JA2529-30.

To facilitate the transaction, AGF and Aik Chuan entered into a Subordination Agreement with AGF (the "Subordination Agreement") by which Aik Chuan agreed to subordinate its promissory notes from the sale of the Rockwood Plant to AGF's loan. JA3198; JA2826-44. Aik Chuan also agreed to assume the outstanding debt on the loan in the event that Global Energy defaulted on its loan with AGF. JA3198.

The initial plan was for the Rockwood Plant to contain six modules, each containing eight reactors. JA3228. The parties' expectation was that AGF's loan would enable Global Energy to finish construction on Module 2. JA3228-29. Third parties validated that the reactors produced renewable diesel via wood pyrolysis and

6

the plant began to receive various certifications for the sale of renewable diesel fuel and associated fuel credits. JA282-84 at 28:3-30:20; JA2222-25; JA3230-32; JA2330-74; *see also* JA293 at 39:3-10.

Nevertheless, Global Energy encountered certain operational issues at the Rockwood Plant, although none of them were atypical of a renewable diesel plant. JA3232-33. Most notably, there was a recurring problem with tarring of the piping in the downstream portion of the module, which required frequent stopping and restarting of the module for cleaning. JA3232. AGF was aware of all of the plant's various operational issues and worked hand-in-hand with Global Energy to resolve them. *See, e.g.*, JA2375-85.

In fact, in April 2021, AGF's Renewables Business Manager/Trader, David Astrauckas, came to the Rockwood Plant and met with executives from Global Energy and Proton Power, Inc. ("Proton Power"), the company that developed the reactors for the Rockwood Plant. JA3233; JA2432-40; JA265-73 at 11:2-19:2; JA2108-09. At this meeting, all parties discussed the ongoing issues with the Rockwood Plant, including the tarring issues discussed above. *Id*. All parties specifically agreed to a solution that included Proton Power providing $200,000 worth of spare piping at no cost. *Id*. Once implemented, the parties' expectation was that Module 2 would be capable of passing the 30-day Verification Test detailed in the Loan Agreement. *Id*. Notably, all parties, including AGF,

7

understood that the implementation of this solution would take at least until mid-June to complete, well past May 1, 2021, which was the last day by which the 30-day Verification Test would need to begin in order to be completed by the Target Verification Date of May 31, 2021. *Id.*

Additionally, after that April 2021 meeting at the Rockwood Plant, AGF requested weekly review meetings starting on April 28, 2021 to discuss: (1) startup progress; (2) any new problems that have arisen; and (3) a new revised plan for the following seven days. JA273-74 at 19:6-20:19; JA2431. Notes from Mr. Astruackas to Kolmar executives from a May 19, 2021 review meeting described that Proton Power would be conducting retrofitting and finalizing the tarring management fix in the last week in May with, once again, the expectation that plan would not be completed until mid-June. *Id.*

Despite those plans, AGF decided not to wait for Global Energy and Proton Power to complete the fixes. Instead, AGF embarked on a plan to put Global Energy in default and to acquire the plant at a foreclosure sale. The first step of that plan was to claim that Global Energy had defaulted on the loan in two ways: (1) by failing to maintain a $50,000 minimum account balance; and (2) by failing to reach Verification by the Target Verification Date. JA3238-39; JA2188. The District Court's opinion below only analyzes the merits of AGF's claim that there was a Verification Test Event of Default.

8

In July 2021, AGF foreclosed on the Rockwood Plant. JA3203. It did so without marketing the Rockwood Plant to a single competitor in the oil and gas industry. JA295 at 41:3-14. Instead, AGF published a cryptic notice for a "FORECLOSURE NOTICE AND U.C.C. SALE" (the "Foreclosure Notice") in the Roane County Newspaper. JA374-78 at 120:15-124:19; JA2203-04. The Foreclosure Notice only listed the boundary coordinates of the property in which the Rockwood Plant sat. *Id*. The notice did not disclose that a renewable diesel plant was on the land or identify any of the equipment or machinery to be sold. *Id*. Unsurprisingly, AGF was the sole bidder at the foreclosure sale and purchased the Rockwood Plant from itself for $1.7 million. JA3242-44.

The sale price was 98% lower than the purchase price Global Energy paid for the Rockwood Plant just a year earlier. JA3227. The foreclosure sale price was also nowhere near *Kolmar's* own contemporaneous valuations of the Rockwood Plant. For example, a week after Kolmar sent its notices of default and just two days before Kolmar sent out its Foreclosure Notice, Kolmar created projections for the Rockwood Plant estimating the plant would generate $254 million in EBITDA from 2021 through 2026. JA351-72 at 97:18-118:19; JA2110-12. Then in August 2021, *after* the foreclosure sale, Kolmar sent financial projections to Deutsche Bank forecasting more than $389 million in EBITDA from 2021 through 2026. JA2130-31; JA353 at 99:10–JA359 at 105:20. Applying any standard industry multiples to

9

these numbers results in a nearly $1 billion valuation of the Rockwood Plant. JA362-63 at 108:22-109:23; JA2134-40.

Following the foreclosure sale, Kolmar demanded that Aik Chuan pay the difference between the outstanding debt owed by Global Energy at the time of the alleged Events of Default ("Outstanding Indebtedness") and the $1.7 million Kolmar paid for the Rockwood Plant at the foreclosure sale. JA3204; JA2210-11. Aik Chuan did not comply with that demand. JA3205.

## II.  PROCEDURAL HISTORY

In January 2022, AGF filed a complaint in the District Court for the Southern District of New York against Aik Chuan for breach of the Subordination Agreement. *See generally* JA18-27. In response, Aik Chuan filed counterclaims against AGF and Kolmar for: (1) breach of the Subordination Agreement and the duty of good faith and fair dealing for erroneous claims of default under the Loan Agreement; (2) breach of the Subordination Agreement and the duty of good faith and fair dealing based on an improper foreclosure sale; and (3) tortious interference with the promissory notes. *See generally* JA28-81.

After a bench trial in November 2023, the District Court issued an order finding that Aik Chuan breached the Subordination Agreement by failing to assume the Loan Agreement and pay off the Outstanding Indebtedness. Specifically, the District Court agreed with Kolmar that Global Energy breached the Loan Agreement

because the Rockwood Plant failed to reach Verification by the Target Verification Date, thereby triggering Aik Chuan's obligations as guarantor. JA218-19.

Additionally, the District Court held that Kolmar's foreclosure sale was proper and that the $1.7 million it paid for the Rockwood Plant represented fair market value. JA229-30. The District Court reasoned that Kolmar followed the requirements to conduct a sale of the plant under Tennessee law, and that, regardless of the rationale for Kolmar's bid amount, it represented the fair market value of the plant because it was not a going concern business. JA233-38.

Finally, the District Court calculated Kolmar's damages to be $28,729,840. *See* JA248-54. Without citing any record evidence, the court arrived at that figure by taking the amount of Outstanding Indebtedness owed at the time of Global Energy's breach, adding the Kicker Fee, and then adding a 25% default interest rate found in the Loan Agreement to the total amount from the date of the breach through the date of the trial. *Id.*

## SUMMARY OF ARGUMENT

The District Court committed four separate legal errors that warrant this Court setting aside the judgment below. *First*, the District Court erroneously concluded that Global Energy defaulted under its loan agreement with AGF—a condition precedent to Aik Chuan's guarantor obligations—notwithstanding that AGF did not follow the loan agreement's mandatory procedures for invoking such a default.

11

Specifically, although Global Energy contractually agreed to certain diesel production milestones by a target date in the loan agreement, the parties agreed that compliance with those milestones would be judged by the Verification Test, a specific type of technical test conducted over a 30-day continuous period explained in detail in the Loan Agreement. It was AGF's responsibility to conduct that test. It never happened. Indeed, AGF specifically agreed to forego the Verification Test until the agreed upon fixes to the Rockwood Plant were fully implemented. Without proof that Global Energy's plant failed the required Verification Test, AGF had no legal basis to declare an Event of Default. The judgment below should be vacated on that basis alone.

*Second*, the District Court failed to analyze AGF's foreclosure sale—which included the sale of valuable equipment and machinery and that AGF advertised as both a foreclosure and U.C.C. sale—under Article 9 of the U.C.C. Had the Court done so, the only conclusion it could have reached was that the sale did not comply with Article 9's requirements that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." N.Y. U.C.C. § 9-610(b). The Court also misanalysed the foreclosure sale under Tennessee real estate law.

*Third*, the Court misapplied Second Circuit precedent regarding the definition of a "going concern" business and, in doing so, arrived at the unsupportable

conclusion that the foreclosure sale price represented fair market value. At trial, the testimony uniformly confirmed that the parties' expectations always were that the Rockwood Plant would generate significant future revenue and profits—the quintessential forward-looking definition of a going concern business—and, as a result, the District Court erred by not valuing the plant as a going concern.

*Finally*, compounding the Court's legal errors on liability, there is also no basis for the District Court calculating AGF's damages to include contract-based interest on unpaid sums. Aik Chuan's only alleged breach here was of the Subordination Agreement which contains no interest provision at all. But even if the interest provisions of the underlying Loan Agreement between AGF and Global Energy applied to Aik Chuan's liability here, that agreement plainly only permits interest to accrue on principal. The District Court erroneously awarded millions of dollars in interest on a large fee that was not principal.

## STANDARD OF REVIEW

After a bench trial, this Court reviews a "district court's finding of fact for clear error and its conclusions of law *de novo.*" *Citibank, N.A. v. Brigade Cap. Mgmt., LP*, 49 F.4th 42, 58 (2d Cir. 2022) (quoting *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187 n.2 (2d Cir. 2013)). "Mixed questions of law and fact are also reviewed *de novo.*" *Id.* (quoting *Kreisler*, 731 F.3d at 187 n.2).

Moreover, a "district court's interpretation of contracts" is reviewed *de novo*. *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 198 (2d Cir. 2003) (citation omitted). And while "the amount of recoverable damages is a question of fact, the measure of damages upon which the factual computation is based is a question of law." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 143 (2d Cir. 2016) (quoting *Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir. 1991)).

Each of the issues raised on appeal herein is a conclusion of law or a mixed question of law and fact and therefore should be reviewed *de novo*. *See Citibank*, 49 F.4th at 58.

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN HOLDING THAT THERE WAS AN EVENT OF DEFAULT

The District Court held that "Aik Chuan breached the Subordination Agreement by failing to assume the Financing Documents and pay the Outstanding Indebtedness." JA219. That finding is erroneous, however, because the Subordination Agreement expressly conditions Kolmar's ability to exercise its remedies, and Aik Chuan's obligation as guarantor, on the existence of a genuine Event of Default under the Loan Agreement, which did not occur. JA2834 ("*if* an Event of Default occurs … under any of the Financing Documents [including the Loan Agreement].").

## A.    AGF Never Conducted the Required "Verification Test" and Kolmar Unequivocally Waived The Verification Target Date

The District Court reasoned that there was an Event of Default under the Loan Agreement because the Rockwood Plant did not pass the Verification Test by the Target Verification Date. JA222-23. In other words, "Module 2 did not and could not perform at the level required by the Loan Agreement" as of the Target Verification Date. *Id.*; *see also* JA2569; JA2572 (Section 8.8 of the Loan Agreement provides that an Event of Default occurs if "[t]he Verification Date shall not have occurred on or prior to the Target Verification Date."). That finding, however, is not supportable because AGF never conducted the contractually required Verification Test and because AGF waived and extended out the Target Verification Date.

### 1.    AGF never conducted a Verification Test

The Loan Agreement defines Verification as "Module II … successfully [meeting] the Verification Testing Criteria set forth on Exhibit B of [the Loan] Agreement]." JA2530. The Verification Date is "the date upon which Verification has occurred, ***as determined by Lender***, in consultation with the ESA Contractor and/or SSA Contractor, pursuant to a written notice delivered to Borrower immediately following the completion of the successful Verification Test." *Id.* (emphasis added). The Loan Agreement specified the "Target Verification Date" as

15

May 31, 2021.  JA2529 (emphasis added).[3]

A plain reading of the Loan Agreement dictates that to declare a Verification Event of Default, AGF, *as Lender*, was required to conduct a specific Verification Test involving specific procedures that were to be conducted by, and in consultation with, third parties.  JA2689-91 (identifying each of the "Verification Testing Criteria," which consists of various performance requirements for the Rockwood Plant (including a 30-day continuous test) and procedures for the testing of those performance requirements required to be "performed by parties selected by Borrower in consultation with the Lender."); *see Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) ("[I]n reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use.").  If AGF finished the Verification Test, AGF was additionally required to provide written notice of its findings to Global Energy. JA2530.

Here, AGF did not even attempt to follow this contractually mandated process.  Just the opposite, it is undisputed that AGF never conducted a Verification Test of any sort, much less one that followed all of the procedures and protocols specified in detail in the Loan Agreement.  JA264 at 10:10-19; JA399 at 145:7-11;

---

[3] Both parties agree that, due to a scrivener's error, the document says May 31, 2020, rather than the intended date of May 31, 2021.

JA3214; JA3239-41. And AGF did not request that Global Energy conduct one either. JA266 at 12:2-8; JA399-JA400 at 145:12-146:19. Nor did AGF provide any type of written notice to Global Energy as specifically required by the Loan Agreement. JA2530; JA3240-41.

The District Court did not explain its holding that "[t]he duty to conduct the Verification Test rested on *Global Energy*" alone and that holding is contrary to the plain meaning of the contractual language. JA225 (emphasis added). It is also equally at odds with the testimony of AGF witnesses who testified that Verification was necessarily a joint process. *See* JA399-JA400 at 145:12-146:2. Because AGF failed to follow the Loan Agreement's detailed prerequisites necessary to declare a Verification Event of Default, there is no legal basis for the District Court's conclusion that Global Energy defaulted. And without an Event of Default, Aik Chuan cannot be held liable to AGF for Global Energy's debt. Accordingly, this Court should reverse the judgment entered in AGF's favor below.

### 2. AGF waived the contractual target deadline

But even if the District Court's interpretation that the duty to initiate and complete a Verification Test rested solely with Global Energy were correct (and it is not), the Court ignored undisputed evidence that AGF clearly and unequivocally extended or waived the May 31, 2021 Target Verification Date deadline by agreeing to a detailed and written remedial plan with Global Energy in the spring of 2021.

17

That plan's timeline made completing the Verification Test by May 31, 2021 literally impossible. JA3233-34; JA3199; JA3213; JA265-67 at 11:2-13:9; JA583-87 at 329:1-333:11; JA2108-09; JA2375-430; JA2432-40.

Specifically, in April 2021, Kolmar's David Astrauckas met with Greg Smith of Global Energy and Proton Power at the Rockwood Plant to discuss solutions to the issues with the plant, JA265-67 at 11:22-13:9, and they established a timeline for implementation of those solutions. JA2432; JA3233; JA584 at 330:8-16; *see supra* pp. 7-8.

Critically, the parties understood that the Rockwood Plant could not operate during the implementation of the agreed-upon plan and that the plan would not be completed before mid-June 2021 at the earliest, *i.e.*, *after* the May 31, 2021 Verification Date "deadline" and well past the last date a 30-day continuous test could have started (*i.e.*, May 1, 2021) to meet the contractual May 31 Target Verification Date deadline. JA267-71 at 13:10-17:22; JA2433-40; JA3233; JA584-87 at 330:25-333:11; *see Garra v. Metro-N. Commuter R.R.*, No. 17-CV-1293, 2021 WL 1536499, at *10 (S.D.N.Y. Feb. 12, 2021) ("A party's words or conduct can serve to 'waive a provision in a contract or eliminate a condition which was inserted for [its] benefit[,]'" which is ***a "concept [ ] frequently applied to deadlines***[.]" (citation omitted) (emphasis added)); *Am. Railcar Indus., Inc. v. GyanSys, Inc.*, No. 14-CV-8533, 2017 WL 11501888, at *6 (S.D.N.Y. Nov. 14, 2017) (finding a party's

18

"concerted efforts to move the [ ] deadline, before [the alleged defaulting party] had even missed it, through a joint replanning exercise with the [defaulting party] clearly demonstrates [an] intent to waive the [ ] deadline for performance, and the no-waiver by oral modification clause along with it."). As a result, the Court's finding that "Module 2 did not and could not perform at the level required by the Loan Agreement as of May 31, 2021" is both speculative (because no Verification Test was performed) and irrelevant. JA293. The parties' communications and course of conduct unequivocally waived that target deadline. Indeed, to the extent there was even a technical Verification Event of Default, AGF purposefully induced it. AGF cannot, on the one hand, agree to a concrete plan to "fix" the Rockwood Plant during the timeframe the parties had targeted to conduct the Verification Test, and on the other hand declare an Event of Default because the Verification Test was not completed by May 31, 2021 (the Target Verification Date).

The District Court's additional finding that AGF could declare the Verification Event of Default because, under the Subordination Agreement, AGF does not waive any rights by "failure or delay in exercising those rights" also misses the mark. JA226 (citing JA2577). Aik Chuan's argument is not that AGF, by virtue of delay, somehow forfeited all rights in perpetuity to declare a Verification Event of Default. Instead, Aik Chuan's argument is that AGF's ***affirmative conduct***, "a joint replanning exercise, … demonstrate[d] [an] intent to waive the [ ] ***deadline*** for

19

[Global Energy's] performance[.]" *Am. Railcar*, 2017 WL 11501888, at *6 (emphasis added) (distinguishing affirmative conduct of a joint replanning exercise from "simply fail[ing] to enforce the deadline"); *see DiStefano v. Maclay*, 102 F. App'x 188, 189 (2d Cir. 2004) ("New York recognizes oral modification or waiver of a contractual provision … when one party has induced the other to rely on an oral modification such that the first party may be equitably estopped from invoking the requirement that any modification be in writing."); Mot. to Alter and Amend Judgment at 8 n.1, ECF 162; *see also, e.g.*, JA732 at 478:1-4. In other words, Aik Chuan's argument is that AGF agreed to postpone its right to declare an Event of Default under the Loan Agreement until a time after the agreed-upon fixes were implemented and a Verification Test could be conducted. Thus AGF's noticed Event of Default under the Loan Agreement prior to this time was improper.

In sum, because AGF never conducted the required Verification Test and because, in any event, AGF waived the May 31, 2021 Target Verification Date deadline, the District Court's judgment in favor of AGF should be reversed.

### B. The District Court Incorrectly Held That Aik Chuan Waived All Defenses To Breach Of The Subordination Agreement

Separately, the District Court also held that Section 8.3 of the Subordination Agreement waives *all* of Aik Chuan's defenses to *any* breach of the Subordination Agreement. JA223-24. As selectively quoted by the District Court, Section 8.3 appears, at first blush, to be an extremely broad provision wherein "the Subordinated

20

Creditor [Aik Chuan] … waives … any allegation … in Law or in equity … based on … unfairness, unclean hands or similar matter in relation to the Loans or any payment." *Id.* (quoting JA2835). But the Court's analysis ignores that the full text of Section 8.3 expressly confines the scope of Aik Chuan's waiver to a very limited set of circumstances with no relevance here. Specifically, Aik Chuan only waived its defenses under Section 8.3 with respect to AGF's right to "obtain direct or indirect control of the Parent." JA2835. Here, neither AGF nor Kolmar took control of any Global Energy entity at any time, thereby rendering Section 8.3 a completely inapplicable red herring.

*     *     *     *

In sum, the District Court erred in holding that an Event of Default occurred under the Loan Agreement.[4] Because such an Event of Default was a condition precedent to Aik Chuan's obligation to repay the Outstanding Indebtedness to AGF under the Subordination Agreement, the judgment below should be reversed.[5]

---

[4] The District Court did not analyze the merits of AGF's other claimed Event of Default related to the Loan Agreement's minimum account balance requirements. JA218 n.6 (Court finding it "unnecessary to resolve" that claim). Accordingly, the Court's liability decision here rests exclusively on whether AGF properly declared an Event of Default related to Verification.

[5] For the same reasons, the District Court also erred in rejecting Aik Chuan's tortious interference claim based on AGF declaring erroneous Events of Default. JA239-41. Compounding that error, the District Court also improperly applied the economic interest defense when it concluded that tortious interference damages were

21

## II.   THE DISTRICT COURT ERRED BY FAILING TO ANALYZE WHETHER THE FORECLOSURE SALE WAS COMMERCIALLY REASONABLE UNDER ARTICLE 9 OF THE U.C.C.

The District Court analyzed the legality of the foreclosure sale exclusively under the Tennessee deficiency judgment statute without engaging in any choice-of-law analysis as to the application of Article 9 of the U.C.C.  Instead, the District Court summarily concluded, without elaboration, that the foreclosure was governed exclusively by Tennessee law because it "occurred pursuant to the Deed of Trust." JA230-33.  In doing so, the District Court ignored the plain language of the relevant Global Energy agreements, including the Deed of Trust for the Rockwood Plant (the "Deed of Trust"), which expressly provides that dispositions of certain collateral shall be governed by the U.C.C.  *Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 51 F.4th 456, 472 (2d Cir. 2022) (subsequent history omitted) ("[C]ontracts should be interpreted so as to effectuate the parties' intent.").  Had the District Court applied Article 9 to the facts surrounding the foreclosure sale, it would have

_____

unavailable because there was no evidence that the Rockwood Plant "would ever have achieved commercial success or that Global Energy would ever had paid off the Promissory Notes." JA241.  Damages for Aik Chuan's tortious interference claim do not turn on whether the Rockwood Plant would be successful or whether the Plant would—or will—achieve commercial success.  Rather, Aik Chuan would be entitled to "damages in the amount of the full pecuniary *loss of the benefits of the contract*" which is exactly what Aik Chuan sought by seeking the value it could no longer recover on the Promissory Notes.  *Protoons Inc. v. Reach Music Publ'g, Inc.*, No. 09-CV-5580, 2016 WL 680543, at *8 (S.D.N.Y. Feb. 19, 2016) (citation omitted).

22

concluded that AGF did not conduct that sale in a commercially reasonable manner and, as a result, that AGF was not entitled to recover on its deficiency claim against Aik Chuan in accordance with N.Y. U.C.C. § 9-626(a)(3) and Tenn. Code. Ann. § 47-9-626(3).

But even if Tennessee real property law has some application here, the District Court also misapplied that law because AGF was not entitled to the "rebuttable prima facie presumption" that the foreclosure sale price of the Rockwood Plant, *i.e.*, $1.7 million, constituted fair market value.

## A.     The Foreclosure Sale Had To Be Conducted In Accordance with the U.C.C.

Despite the clear and unambiguous title of Kolmar's *public* "Foreclosure Notice **and U.C.C. Sale**," the District Court's legal analysis of the foreclosure sale ignores the U.C.C. entirely except for a single conclusory sentence, without any supporting legal analysis, that the foreclosure sale also "met the commercial reasonableness standard under the U.C.C. that governs a sale of collateral when it is sold separately from real estate." JA233-34. That was reversible legal error.

*First*, the District Court did not explain the basis for its conclusion that the Deed of Trust exclusively governed the foreclosure such that it needed to apply only Tennessee law and not the U.C.C. JA230; JA233. That conclusion is also contrary to the undisputed facts. While the District Court referenced a letter in its findings of fact stating that AGF planned to conduct "a foreclosure sale 'pursuant to the Deed

23

of Trust[,]'" JA211, the District Court failed to reconcile this conclusion with its later finding that AGF explicitly advertised the foreclosure as "***both*** a 'Foreclosure Notice ***and U.C.C. Sale*[.]'"** JA213 (emphasis added); JA2203; *cf.* JA230-33.

And although the District Court noted that a secured party may proceed as to both personal and real property in accordance with New York and Tennessee real property rights at the party's election, the District Court made no determination as to whether AGF actually made such an election. Had the District Court engaged in such analysis, it would have reached the conclusion that AGF *did not* proceed solely under real property law because AGF provided clear notice to the public that the sale was proceeding in accordance with the U.C.C. when it published its "Foreclosure Notice ***and U.C.C. Sale*[.]"** JA2203; *see* Tenn. Code Ann. § 47-9-604(a); N.Y. U.C.C. Law § 9-604(a); *see also* Tenn. Code Ann. § 47-9-604(b) (same for security agreements covering real property and fixtures); N.Y. U.C.C. Law § 9-604(b) (same).

*Finally*, the District Court erred in reaching this conclusion because, as the District Court recognized, both the Security Agreement ***and*** the Deed of Trust permitted AGF to conduct a sale of the personal property and the land upon an Event of Default. JA197-99 (citing JA1136-76; JA1177-1202). And ***both*** of those agreements expressly identify the U.C.C. as applicable to the disposition of certain collateral. Specifically, the Deed of Trust applied Tennessee law to the sale of the

24

"Deed of Trust Estate," but also created a "Security Agreement" under the U.C.C. as to "U.C.C. Collateral," defined as: "personal property within the meaning of the Uniform Commercial Code or other law with respect to the Personalty, Improvements, Fixtures, Leases, Rents, Records, Property Agreements." *See* JA1181-86; JA1188-89; JA1192. And, where the Trustor sells the "Deed of Trust Estate," which includes the U.C.C. Collateral, the Deed of Trust separately addresses the transfer and disposition of "U.C.C. Collateral" and there is an acknowledgement regarding "any notices required or permitted under the Uniform Commercial Code[.]" JA1192. The District Court also ignored the legal significance of its own finding that the Security Agreement secured the personal property at the Rockwood Property, including all of the valuable equipment and technology at the plant, pursuant to Articles 8 and 9 of the U.C.C. JA1136-76; JA197.

### B. The Foreclosure Sale Was Plainly Commercially Unreasonable Under The U.C.C.

Under the U.C.C., "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." N.Y. U.C.C. § 9-610(b); Tenn. Code Ann. § 47-9-610(b). Kolmar, as the secured party seeking a deficiency judgment, bears the burden of establishing compliance. *BancAmerica Priv. Brands, Inc. v. Marine Gallery, Inc.*, 550 N.Y.S.2d 720 (2d Dep't 1990); *Cullum & Maxey Camping Ctr., Inc. v. Adams*, 640 S.W.2d 22, 25 (Tenn. Ct. App. 1982).

25

When determining commercial reasonableness, "courts look to 'the totality of the circumstances' and 'should consider accepted business practices in the particular industry[.]'" *Patriarch Partners XV, LLC v. U.S. Bank Nat'l Ass'n*, No. 16-cv-7128, 2017 WL 3822603, at *4 (S.D.N.Y. Aug. 28, 2017); *see also Coxall v. Clover Com. Corp.*, 781 N.Y.S.2d 567, 574 (N.Y. Civ. Ct. 2004); *Mallincoat v. Volunteer Finance & Loan Corp.*, 415 S.W.2d 347, 350 (Tenn. Ct. App. 1966). The secured party must use "reasonable commercial practices among dealers in the type of property," N.Y. U.C.C. § 9-627(b)(3); Tenn. Code Ann. § 47-9-627(b)(3), including to "maximize the return on the collateral." *Granite Partners v. Merill Lynch, Pierce, Fenner & Smith Inc.*, No. 96-CV-7874, 2002 WL 975606, at *1 (S.D.N.Y. May 10, 2002).

When a secured party "fails to prove that [the] disposition" complied with Article 9, including its commercial reasonableness requirement, "the liability of a debtor or secondary obligor for a deficiency is limited to an amount by which the sum of the secured obligation, expenses, and attorney's fees exceeds the greater of: (a) the proceeds of the … disposition … or (b) the amount of proceeds that would have been realized had the noncomplying secured party" complied with Article 9. N.Y. U.C.C. § 9-626(a)(3); *accord* Tenn. Code. Ann. § 47-9-626(3). That is, in such cases, the secured party faces a "rebuttable presumption" that it does not have a deficiency claim, and "in order to recover a deficiency judgment," is "required to prove that," had it complied with Article 9, "the proceeds from the sale still would

26

have been an amount less than the sum of the secured obligation" plus costs. *Regions Bank v. Thomas*, 532 S.W.3d 330, 339 (Tenn. 2017); *accord Coxall v. Clover Commercial Corp.*, 781 N.Y.S.2d 567, 664 (N.Y. Civ. Ct. 2004).

Moreover, special rules requiring heightened scrutiny apply where, as here, the secured party buys the collateral at a foreclosure sale. N.Y. U.C.C. § 9-615(f); Tenn. Code. Ann. § 47-9-615(f). This rule protects against artificially low-priced sales out of a recognition that "when the foreclosing secured party … is the transferee of the collateral, the secured party sometimes lacks the incentive to maximize the proceeds of the disposition." U.C.C. § 9-615 cmt. 6.

Moreover, "a low price suggests that a court should scrutinize carefully all aspects of a disposition to ensure that each aspect was commercially reasonable." N.Y. U.C.C. § 9-627, cmt. 2; *accord* Tenn. Code Ann. § 47-9-627, cmt. 2. Importantly, "[s]uch scrutiny is especially appropriate where self-dealing is alleged." *In re Zsa Zsa Ltd.*, 352 F. Supp. 665, 671 (S.D.N.Y. 1972), *aff'd*, 475 F.2d 1393 (2d. Cir. 1973); *see also Cent. Budget Corp. v. Garrett*, 368 N.Y.S.2d 268, 270 (2d Dep't 1975) ("[M]arked discrepancies between the disposal and sale prices signal a need for closer scrutiny, especially where, as here, the possibilities for self-dealing are substantial.").

Here, the District Court erred by not applying the U.C.C.'s heightened scrutiny rules, as the evidence at trial clearly and consistently raised the issue of self-

27

dealing. *See* JA666 at 412:10-14; JA3779; JA3202-03; JA3221-22; JA2190-96; JA1158; JA2833. Indeed, the same secured party, AGF, both foreclosed on the Plant and also purchased it. The evidence at trial was undisputed that the same entity was functionally both the buyer and the seller. *See* JA666 at 412:10-14; JA3779.

The U.C.C.'s heightened scrutiny rules also apply here because the foreclosure sale price, $1.7 million, was a shockingly low price compared to every other valuation admitted at trial. *See* JA3855-56. The court's observation that $1.7 million was "the only price at which there was a willing buyer" is not sufficient to demonstrate that fair market price was achieved. JA235. Just the opposite, the evidence admitted at trial proved that both before and after the foreclosure sale, Kolmar valued the Rockwood Plant at far more than $1.7 million, including projecting that the plant would generate $254 million in EBITDA over six years just six days after sending the notice of default. JA2232-34; JA2311-12; JA290-92 at 36:25-38:22; JA351-72 at 97:18-118:19; JA2110-12; JA2130-87; JA2315; JA3237. Although AGF sold the Plant to itself at the foreclosure sale, and $1.7 million was orders of magnitude lower than any of Kolmar's contemporaneous valuations, the District Court did not analyze any Article 9 principles, much less apply the required heightened scrutiny. But regardless of what level of Article 9 scrutiny is applied to the undisputed facts here, AGF's Foreclosure Sale did not comply with the law.

*First*, a shockingly low price is, in itself, also a fact indicative of commercial

28

unreasonableness, with courts routinely holding comparatively smaller price discrepancies to be unreasonable. *See e.g.*, *First Interstate Credit All., Inc. v. Clark*, No. 89-CV-3263, 1989 WL 149078, at *3 (S.D.N.Y. Dec. 4, 1989) (discrepancy between $40,000 foreclosure sale price and $67,500 sale price for a tractor "just a few months prior" created issue of fact as to commercial reasonableness of the foreclosure sale); *U.S. v. Conrad Pub Co.*, 589 F.2d 949, 952 (8th Cir. 1978) (holding low price is one factor going to commercial reasonableness); *U.S. v. Terrey* 554 F.2d 685, 694-96 (5th Cir. 1977) (same).

*Second,* the evidence at trial confirmed the arbitrariness of the foreclosure sale price. AGF decided on the $1.7 million bid amount either the day before, or morning of, the foreclosure sale. JA377 at 123:4-10. It did not take into account the value of any of the land, buildings, know-how, or future production value, even though AGF acquired these at the foreclosure sale. *See* JA378 at 124:14-19; JA3405; JA 3410-11; JA3414; JA2235-66.

Instead, AGF started with a year-old machinery and equipment appraisal riddled with indicia of unreliability, JA3402-38, and subtracted a lien and its estimated legal costs in a future lawsuit against Aik Chuan. JA377 at 123:11-24. By definition, the mechanics lien and unaccrued legal fees are not probative of *any* value at the Rockwood Plant. And the Branford Valuations, LLC ("Branford") "Machinery & Equipment Appraisal" did not provide *any* value for the entire

29

Rockwood Plant or its enterprise value. JA3410-12; JA3414; JA3417. It did not even provide the appropriate value for the machinery itself. JA3407-10; JA3415-17; JA420-24; JA3426-28; JA3431-32; JA3438.

*Third*, the court's conclusion that AGF "had no obligation to market" the sale "to anyone" and that publishing the foreclosure notice in the local newspaper was sufficient (JA236) cannot be squared with Article 9's requirement of "conformity with reasonable commercial practices among dealers in the type of property," N.Y. U.C.C. § 9-627(b)(3); Tenn. Code Ann. § 47-9-627(b)(3), as well as efforts to "maximize the return on the collateral." *Granite Partners*, 2002 WL 975606, at *1; *see* JA3251; JA3285-87.

Kolmar came nowhere close to meeting the U.C.C.'s "obvious" marketing requirement that a secured party make "significant attempts to reach the most logical purchasers." *In re Four Star Music Co.*, 2. B.R. 454, 462 (Bankr. M.D. Tenn. 1979); *accord Gen. Elec. Credit Corp. v. Durante Bros & Sons, Inc.*, 433 N.Y.S.2d 574, 576 (1st Dep't 1980) (requiring efforts to reach "the intended market"); *CCO Condo Portfolio (AZ) Junior Mezzanine, LLC v. Feldman*, 21-CV-2508, 2024 WL 622098, (S.D.N.Y. Feb. 14, 2024) (sale of interests in condominium projects commercially reasonable where advertised to "an investor list of more than 31,000 contacts," which "efforts had resulted in … 97 of those potential bidders entering the data room and 88 of them downloading the due diligence materials," including "all the

sophisticated buyers you would expect to participate in an auction of this kind—

Goldman Sachs, KKR, Apollo").

Here, it is undisputed that AGF made no meaningful efforts to market the

foreclosure sale to a wide audience of potential purchasers. JA295 at 41:11-14 ("Q.

In fact, there were no discussions with Kolmar about marketing the Rockwood plant

to any [prospective] buyers before foreclosure, correct? A. That's correct."). AGF

noticed a "Foreclosure Notice And U.C.C. Sale" exclusively in the local Roane

County Newspaper and that notice described only the boundaries of the land. The

foreclosure notice did not give any indication that there was a renewable diesel plant

on the land or describe any of the machinery or equipment being sold. JA2203-04;

JA376 at 122:12-24; JA3848-49; JA3855-56; *see In re Zsa Zsa*, 352 F. Supp. at 669

(sale commercially reasonable where "notice adequately described the types of

goods to be sold" and "referred to documents and samples which bidders could

inspect prior to the sale date"); *Gen. Elec. Credit Corp.*, 433 N.Y.S.2d at 576

(disposition of heavy construction equipment was commercially unreasonable

because "newspaper selected for advertising was clearly not the most appropriate

one for reaching the intended market"); *Smith v. Daniels*, 634 S.W.2d 276, 279

(Tenn. Ct. App. 1982) (local newspaper publication, courthouse notice, and phone

calls to equipment dealers in yellow pages was commercially unreasonable because

these methods "were inadequate to reach persons interested in the sale of this type

of equipment," where industry practice was advertising in trade magazines and circulating flyers to dealers).

Despite the U.C.C.'s requirement to use "reasonable commercial practices among dealers in the type of property," N.Y. U.C.C. § 9-627(b)(3); Tenn. Code Ann. § 47-9-627(b)(3), AGF took none of the steps that would be standard in auctions for assets like the Rockwood Plant to "maximize the price," JA3251; JA3285-87, including hiring an investment banker, preparing marketing materials, or obtaining a third-party valuation. JA376-77 at 122:25-123:3; JA375 at 121:5-9; JA3242. *See Liberty Nat'l Bank & Tr. Co. of Oklahoma City v. Acme Tool Div. of Rucker Co.*, 540 F.2d 1375, 1377-78, 1382 (10th Cir. 1976) (sale of oil rig commercially unreasonable where bank ignored that "ordinary method for selling a drilling rig" included "notify[ing] interested persons and, in addition, advertis[ing] the sale in trade journals"); *United States v. Conrad Pub. Co.*, 589 F.2d 949, 954-55 (8th Cir. 1978) (sale commercially unreasonable where there was no effort to market printing equipment "in national trade publications" or "notify regional and national printing equipment dealers" and advertising was "unreasonably limited in scope" because "[o]nly seven letters were sent to North Dakota publishers," "[o]nly two advertisements were placed in North Dakota newspapers," and "only six hundred handbills distributed.").

*Fourth*, AGF's bid was the only bid at the foreclosure sale. JA3855-56. This

32

was a natural and intended result of AGF's failure to market it properly or even accurately. *See* JA3251; JA3285. A low number of bids is also indicative of commercial unreasonableness. *See, e.g.*, *In re Four Star Music Co.*, 2 B.R. at 463-64 (disposition commercially unreasonable in part because "[t]he number of bids solicited was minimal"); *Cent. Budget Corp.*, 368 N.Y.S.2d at 269-70 (disposition commercially unreasonable where only "five or six persons" bid on a car). As Kolmar's CFO admitted, "if you want to maximize the value or to obtain market value at an auction, you should design it such that you get a sufficient number of prospective buyers to attend that auction." JA374-75 at 120:25-121:4. The evidence at trial established that Kolmar purposefully did just the opposite.

For all these reasons, if the District Court had properly analyzed the foreclosure sale under U.C.C. Article 9, the District Court would have concluded that the foreclosure sale was not commercially reasonable and therefore did not pass muster under the U.C.C. Such a conclusion would, at a minimum, wipe out AGF's deficiency claim entirely. *See* N.Y. U.C.C § 9-626(a)(3); Tenn. Code Ann. § 47-9-626(3) (failure to comply with Article 9 results in rebuttable presumption that secured party is not entitled to any deficiency).

Finally, after setting aside Kolmar's deficiency claim, both the law and the Subordination Agreement's terms dictate that the District Court should have next turned to calculating what sum would fully compensate Aik Chuan for the

foreclosure sale price being minuscule compared to its true market value. *See* Tenn. Code. Ann. § 47-9-615(d)-(f); N.Y. U.C.C. § 9-615(d)-(f); JA2831 ("In the event of any distribution … voluntary of involuntary, … of the assets of the Subordinated Debtor or the proceeds thereof … to the creditors of the Subordinated Debtor … or upon the sale of all or substantially all of the Subordinated Debtor's assets, then, in any such event, (i) Senior Creditor shall first receive indefeasible payment in full in cash of all of the Senior Obligations ***prior to the payment of … the Subordinated Obligations***" (emphasis added)).

## III. THE DISTRICT COURT MISAPPLIED TENNESSEE REAL PROPERTY LAW

To the extent Tennessee real property law applies here, the District Court misapplied it because it did not properly analyze: (1) whether the statutory presumption of fair market value applies at all; and (2) if that presumption does apply, whether Aik Chuan overcame it. JA235-38.

### A. The Court Erred In Applying Rebuttable Presumption Of Fair Market Value By Ignoring That There Was Evidence of Fraud, Irregularities, Or Collusion

The District Court only considered whether the foreclosure sale complied with the deficiency judgment statute under Tennessee law, which provides that a creditor can recover through a deficiency judgment the balance of an outstanding debt after

34

a foreclosure sale. Tenn. Code Ann. § 35-5-117(a).[6] The deficiency judgment is calculated as the total amount of indebtedness minus the fair market value of the property and the costs of the sale unless there is "a showing of fraud, collusion, misconduct, or irregularity in the sale process." *Id*. at § 35-5-117(b). The creditor is also entitled to a "rebuttable prima facie presumption" that the sale price is equal to the fair market value of the property, but this can be overcome if the debtor can "prove by a preponderance of the evidence that the property sold for an amount materially less than the fair market value of property at the time of the foreclosure sale." *Id*. at § 35-5-117(c). If the debtor so proves, "the deficiency shall be the total amount of the indebtedness prior to the sale plus the costs of the foreclosure and sale, less the fair market value of the property at the time of the sale as determined by the court." *Id*.

As a preliminary matter, the District Court did not properly analyze the question of whether AGF is entitled to the rebuttable presumption that the $1.7 million sale price constituted fair market value. Although neither the Tennessee Code Annotated nor Tennessee courts have defined what constitutes "fraud, collusion, misconduct, or irregularity in the sale process" under § 35-5-117(b), at least one Tennessee court suggested that "proof that [the foreclosing party] acted in

---

[6] Tenn. Code Ann. § 35-5-117 was formerly Tenn. Code Ann. § 35-5-118 and is used interchangeably in the case law.

any way to negatively impact the foreclosure sale price" could suffice as evidence of collusion, irregularity, fraud, or misconduct in a foreclosure process. *Cap. Bank v. Brock*, No. E2013-01140-COA-R3CV, 2014 WL 2993844, at *7 (Tenn. Ct. App. June 30, 2014).

The District Court did not consider this case law or whether AGF "acted … to negatively impact the foreclosure sale price," *id.*, but instead made the conclusory and circular finding there were no "irregularities" in the foreclosure process because AGF "complied" with Tennessee law. JA233-36. That was clear error.

Had the District Court conducted the proper analysis, it would have determined that AGF "negatively impact[ed] the foreclosure sale price" and was not entitled to the statutory presumption that the plant's $1.7 million sale price constituted fair market value. *Cf. Brock*, 2014 WL 2993844, at *7. Specifically, AGF was only able to purchase the Rockwood Plant for pennies on the dollar due to self-dealing, *i.e.*, collusion, by purposefully misrepresenting and inadequately describing the Rockwood Plant and equipment in the Foreclosure Notice, and by choosing not to market the Rockwood Plant, *i.e.*, prime examples of misconduct and irregularities. *Cf. Cap. Bank*, 2014 WL 2993844, at *7.

### B. The District Court Did Not Analyze Whether The Plant Sold For A Price Materially Less Than The Fair Market Value

Even if the District Court correctly concluded that AGF is entitled to the rebuttable presumption that $1.7 million constituted fair market value, the Court still

erred because it failed to consider or analyze whether Aik Chuan rebutted that presumption with evidence that the Rockwood Plant sold for an amount materially less than the fair market value of the property at the time of the foreclosure. Tenn. Code Ann. § 35-5-117(c).

Instead, the District Court cited New York law—not Tennessee law—and characterized Aik Chuan's valuation evidence as merely an "alternative calculation of value." JA233; JA236-38. However, that conclusion ignores applicable Tennessee law and the overwhelming valuation evidence offered at trial. While fair market value must be "at the time of the foreclosure," Tennessee courts have considered evidence before or after the time of foreclosure where it is "relevant and helpful to establish fair market value," including because there was an "absence of other potentially relevant proof, such as an appraisal of the property around the time of the foreclosure[.]" *Cutshaw v. Hensley*, 2015 WL 4557490, at *6 (Tenn. Ct. App. July 29, 2015); *see also Eastman Credit Union v. Bennett*, No. E201501339COAR3CV, 2016 WL 1276275, at *9 (Tenn. Ct. App. Mar. 31, 2016) (defendant / debtor overcame the rebuttable fair market value presumption, including by considering evidence of fair market value before and after the foreclosure sale).

Here, the District Court did not consider that: (1) there was no evidence that $1.7 million constituted fair market value at the time of Foreclosure because it was

a number AGF selected arbitrarily (*see supra* Section II.B); or (2) whether the evidence from before and after the foreclosure sale established that $1.7 million was "materially less than the fair market value," as required under Tennessee law. Had the District Court considered those factors, it would have concluded that Aik Chuan rebutted any applicable presumption of fair market value because the evidence uniformly established that $1.7 million was "materially less than" fair market value. The admitted evidence on this topic included:

- Numerous valuations that Kolmar considered during its Loan Agreement due diligence that projected tens of millions of dollars in EBITDA, JA286-92 at 32:13–38:21; JA2226-27; JA2232-34;

- a 2017 third-party appraisal that valued the Plant between $85.8 million and $125.7 million, JA3197;

- Kolmar's June 2020 EBITDA projection of $30 million, JA2311-12; JA292 at 38:12-22;

- a $100 million valuation that Kolmar assigned Global Energy in May 2021 by recommending that it offer 5% equity in Global Parent Co. to Resilient Energi for $5M, JA2351; JA3237;

- a $50 million annual EBITDA projection in Kolmar's June 2021 Financial Model, JA2110-12; JA350-53 at 96:8-99:9;

- Kolmar's projection of $389 million in total EBITDA through 2026 in the August 2021 financial model it sent Deustche Bank, JA2130-31; JA353-59 at 99:15-105:3;

- Kolmar's projection of $1.4 billion in total EBITDA through 2025 and $1.19 billion in net present value in materials it sent to Deutsche Bank in April 2022, JA2132-87; JA359-72 at 105:8–118:19; *see* JA347-50 at 93:23-95:14; JA398 at 144:19-23.

Rather than consider any of that evidence, the District Court instead only considered a *portion* of the plant's sale price the year before the foreclosure sale, erroneously finding that the $85 million sale price cannot constitute evidence of fair market value because only $250,000 was paid at closing with the "remainder of the purchase price" "reflected in the equity warrant and the Promissory Notes."[7] JA235-36. But the Court's logic is fundamentally flawed because there is no financial or legal authority to support the proposition that the value of a purchased asset principally turns upon how much of the purchase price is paid in cash at closing compared to how much is financed by debt or equity. Nor did the District Court cite to any authority purporting to stand for such a novel proposition.

## C. The Foreclosure Amount Was Not Fair Market Value

Finally, the District Court's conclusion that the Foreclosure Amount constituted fair market value was based on two additional legal errors. JA235. *First*, the District Court misapplied this Court's case law holding that "a recent sale price for the subject asset, negotiated at arm's length, is the best evidence of [the asset's]

---

[7] The district court also provided no support for its suggestion that fair market value could be based, in part, on a finding that the "Plant was largely defunct." JA234-35. As explained above and below, the plant was not "largely defunct," *see infra* Section III.C.2, and the valuations show that $1.7 million was "materially less" than fair market value, including because there were "no significant changes" to the property between valuations, *i.e.*, before or after the foreclosure sale. *Cutshaw*, 2015 WL 4557490, at *6.

market value." JA233 (quoting *Schonfeld v. Hilliard*, 218 F.3d 164, 178 (2d Cir. 2000)).[8] That case law is wholly inapplicable here, however, because the foreclosure sale was not an arm's length transaction. *Second*, the District Court wrongly held that the Rockwood Plant was not a going concern business and therefore could not be valued using conventional valuation tools like a discounted cash flow analysis. JA237-38. In truth, all the record evidence admitted at trial established that the Rockwood Plant met this Circuit's forward-looking definition of a going concern business, and the Court should therefore have valued the plant using a going concern valuation method.

### 1. The Foreclosure Sale Was Not An Arm's Length Transaction

Black's Law Dictionary defines arm's-length as "dealings between two parties who are not related or not on close terms." (11th ed. 2019). The Supreme Court of the United States has embraced a similar definition. *U.S. Bank Nat'l Ass'n v. Vill. At Lakeridge, LLC*, 583 U.S. 387, 397 (2018) ("the widely (universally?) understood definition of an arm's-length transaction" is "a transaction conducted as though the two parties were strangers"). This Court's precedent is equally clear that

---

[8] Tennessee law follows the same principle, and, importantly, contains the same central prerequisite. *See Hartigan v. Brush*, 2021 WL 4983075 at *13 (Tenn. Ct. App. Oct. 27, 2021) (fair market value is price paid on open market in arm's-length transaction); *State v. Lyons*, 669 S.W.3d 775, 793 (Tenn. 2023) (Kirby, J., concurring in part) (same).

a transaction cannot be arm's length where the same party stands on both sides. In *In re TransCare Corp.*, a businesswoman caused an entity she controlled to foreclose on and transfer collateral to another entity she likewise controlled. No. 20-CV-06274, 2021 WL 4459733, at *1 (S.D.N.Y. Sept. 29, 2021). The lower court held that the transaction was not arm's-length because the same person "dictated the timing of the foreclosure and transfer of the Subject Collateral," "stood on every side," and "controlled every aspect of the transaction." *Id.* at *9 & n.78. This Court affirmed, emphasizing that functionally the defendant sold "the Subject Collateral … to herself." *In re TransCare Corp.*, 81 F.4th 37, 49-50 (2d Cir. 2023); *see also In re Matter of Newmark*, 20 B.R. 842, 855-856 (Bankr. E.D.N.Y. 1982) (not "arm's length" because "buyer and seller … were the same entity").

Here, the record evidence is unanimous that AGF stood on both sides of the transaction and the foreclosure sale was not between "two strangers." *U.S. Bank*, 583 U.S. at 397. AGF was functionally both the seller and buyer of the Rockwood Plant at foreclosure. AGF dictated the marketing, timing, place, and manner of the foreclosure sale, just like the defendant in *TransCare*, and then purchased the Plant itself as the sole bidder. *See* JA666 at 412:10-14; JA3779; JA3202-03; JA3221-22; JA3242; JA2190-96; JA1158; JA2833. Accordingly, the foreclosure sale price AGF paid here is not probative of the plant's fair market value at all, much less the "best evidence" of that value as the District Court wrongly concluded.

### 2. The District Court Misapplied Governing "Going Concern" Caselaw To The Undisputed Facts Established At Trial

Where a recent sale was not conducted at arm's length, courts look to other evidence, including expert opinions on valuation. *Schonfeld*, 218 F.3d at 178. Here, the District Court improperly rejected the discounted cash flow valuation opinion of Aik Chuan's expert, Marc Brown, principally based on the Court's conclusion that the Rockwood Plant was not a going concern business at the time of the foreclosure sale. *See* JA236-37.

The Second Circuit in *In re TransCare Corporation* defined going concern as "the value of a commercial enterprise's assets … as an active business with ***future earning power***." 81 F. 4th at 52 (quoting Black's Law Dictionary (11th ed. 2019)) (emphasis added).[9] The District Court correctly adopted that definition, but then misapplied it to the facts of this case. JA237. A key characteristic of a going concern business is the *expectation* of continued operations and potential future income generation. *See TransCare*, 81 F.4th at 52 ("Tilton herself admitted that the Subject Collateral had going-concern value when she emailed an insurer and communicated

---

[9] Tennessee law is substantially the same. *See McIllwain v. Hoover*, No. M2013-01277-COA-R3CV, 2014 WL 2155348, at *6 (Tenn. Ct. App. May 19, 2014) (adopting Black's Law definition of a "going concern" as "[a] commercial enterprise actively engaging in business with the expectation of indefinite continuance" and noting that a business is sold "as a going concern" when "sold as a complete unit" including "essentially all of the tangible and intangible assets").

her *intent to operate* those divisions in a new company … [I]nternal *projections* estimated that the Subject Collateral could generate an EBITDA of $4 million annually … which … leads to a *going concern* valuation well above $10 million" (emphasis added)).  Accordingly, it is a forward-looking test at the time of the valuation.  *See id.* ("If liquidation in bankruptcy was not clearly imminent on the transfer date, then the entity should be valued as a going concern."); *see also In re Adelphia Comms. Corp.*, 512 B.R. 447, 495 n.251 (Bankr. S.D.N.Y. 2014) ("[A] business does not have to be thriving to receive going concern valuation" (citation omitted)).

Here, the uniform expectations of the parties, based on financial projections compiled both before and after the foreclosure sale, were that the Rockwood plant would generate future revenues and substantial profits.  Indeed, the District Court recognized on the record that those facts were undisputed.  *See* JA593 at 339:6-9 (Court: "So I actually think the evidence in the record is that at the time of the foreclosure, [AGF and Kolmar] did believe in the process. It hadn't been commercialized yet, but they did think it was valuable. So I don't think it's disputed").  The Rockwood Plant therefore meets this Circuit's forward-looking definition of a going concern business and the District Court should have considered the value of the Rockwood Plant as a going concern business.

But instead, the District Court gave no consideration or weight to the parties'

financial *expectations* for the plant and incorrectly focused on the Plant's *current* state of commercialization at the time of the foreclosure sale, concluding it was not a going concern because it "could not run continuously" or produce diesel "in commercial quantities." JA237.

To be sure, there is no dispute that the Rockwood Plant had operational issues in the spring of 2021. But no part of this Circuit's definition of a going concern business requires that the business is fully or even partially commercialized and/or generating current revenue. The definition is forward looking. And the evidence at trial overwhelmingly and consistently demonstrated that all interested parties reasonably thought the Rockwood Plant had a bright financial future.

For example, in May 2021, Kolmar President Raf Aviner wrote that "[o]ur overall objective is, and we are successfully moving in this direction, to take over management of the project. The project continues to have the promise we always envisaged." JA2100-01. That same month, he told Aik Chuan that "the Rockwood site will be able to sustain itself well within the next 6 months by meeting the 75% operating objective." JA2099. At a June 10, 2021 Kolmar AG board meeting, weeks before the foreclosure sale, Mr. Aviner told the board that the Plant's "projected profitability [was] extraordinary" and if Kolmar came to own the Plant, "financing would eventually be easily achievable." JA2121; *see also* JA385-86 at 131:3-132:11. Kolmar's June 2021 Rockwood financial model projected $254 million in

total EBITDA between 2021 and 2026. JA2110-12; JA350-53 at 96:8-99:9. Equally important, Kolmar's board minutes confirm that Kolmar planned to make significant capital investments in the Rockwood facility following the foreclosure sale. JA2120-21; JA385-88 at 131:3-134:6; JA391-92 at 137:6-138:2. Needless to say, only a going concern enterprise can have planned future capital expenditures.

After the foreclosure sale, Kolmar took possession of the Rockwood Plant and its August 2021 model included a plan for a trial campaign of Module 2 and projected $389 million in total EBITDA. JA353-57 at 99:15-103:18*; see also* JA357-38 at 103:24-104:6. Significantly, Kolmar projected such cash flow because all relevant parties believed that the plant's operational issues referenced in the District Court's opinion were ultimately fixable. *See* JA2128-29; JA267 at 13:7-17; JA275-77.

This Circuit's definition of a going concern business also cannot be squared with the District Court's criticism of Marc Brown's valuation opinions on the grounds that his discounted cash flow analysis "reflect[s] a fully commercialized plant with an operating capacity of either six or eighteen modules" and "assume[s] that Module 2 had passed the Verification Test and that many more identical modules had been constructed and were functioning at a commercial level." JA238. A going concern business valuation is necessarily based on future financial projections. *See TransCare*, 81 F.4th at 52. What matters is whether those

45

assumptions were reasonable in the minds of the relevant parties at the time, an issue the District Court did not even address. *See* JA3140; JA679-80 at 425:24-426:7.

Here, Kolmar's witnesses repeatedly testified that they believed that the assumptions in Kolmar's financial models and projections were reasonable, including that Module 2 would be fixed and then used as template for the buildout of additional modules ultimately as part of a fully commercialized plant. *See* JA2107; JA358 at 104:18-22; JA2131; *see also* JA348-49 at 94:22-95:8; *TransCare*, 81 F.4th at 52. This is also significant because Aik Chuan's expert based his going concern valuation on those very same contemporaneous projections created by AGF—not Global Energy or Aik Chuan.

The District Court also wrongly concluded that the Rockwood Plant was "not an active business" at the time of the foreclosure sale because the plant was a "novel, unproven technology" and needed additional capital investment. JA237-38. This holding is squarely contradicted by the overwhelming evidence at trial that proved just the opposite.

*First*, it is undisputed that the Plant's core wood pyrolysis technology worked well. JA266 at 12:19-24 ("Q: And you also talked about the fact that although there were issues with commercial viability, the reactors reliably produced syngas, correct? A: They reliably produced diesel. Q: They reliably produced both diesel and syngas, correct? A: Yes."); *see also* JA3211-12; JA3218; JA3229; JA2920-31.

46

*Second*, all relevant parties at the time of the foreclosure sale believed the problems preventing the Plant from running continuously to produce renewable diesel were fixable. *See* JA2330-32; JA267 at 13:7-17; JA275-77; JA2108-09.

*Third*, even if the issues preventing continuous production of renewable diesel eventually proved to not be fixable, those issues did not affect the Rockwood Plant's undisputed ability to produce a different, but also highly valuable, product: biochar. *See* JA293 at 39:11-14 ("Yes, it certainly can make biochar."); JA364 at 110:5-7 (Q: "Everyone agrees this plant can make credible biochar that can be sold; correct?" A: It can make biochar; correct."); JA508 at 254:5-8 ("Q: [T]o the extent there were issues with the reliability of the downstream process, would that affect biochar production? A: No."); JA365 at 111:7-12 ("Q: And what you're telling Deutsche Bank is while we did include some biochar in our projections, if you tweaked an assumption about biochar, it's possible you could get … another 179 million [net present value] potentially. A: Correct."). The District Court's Opinion below does not even mention the word "biochar," much less consider all the evidence at trial which established that, at the time of the foreclosure sale, the Rockwood plant could generate significant revenue from producing that byproduct.

Because both the law and the evidence firmly establish that the Rockwood Plant was a going concern business at the time of the foreclosure sale, the District Court should have valued the Rockwood Plant as such, and the only going concern

analysis entered into evidence at trial was Marc Brown's valuation utilizing a discounted cash flow analysis, a methodology widely recognized by courts as the most appropriate method for valuing going concern businesses. *See In re Iridium Operating LLC*, 373 B.R. 283, 351 n.51 (Bankr. S.D.N.Y. 2007) ("[W]hen a company is a start-up, DCF is 'most appropriate' method to value the company"); *Questrom v. Federated Dep't Stores*, 84 F. Supp.2d 483, 488 (S.D.N.Y. 2000) (DCF "preeminent valuation methodology"), *aff'd*, 2 F. App'x 81 (2d Cir. 2001).

But beyond Mr. Brown's expert opinions, the reality is that any credible attempt by the District Court to value the Rockwood Plant as going concern would necessarily have resulted in the Court finding that the Plant's value far exceeded the Outstanding Indebtedness, meaning that Kolmar's debt was over secured and Kolmar should not have been entitled to any recovery against Aik Chuan. But the Court never undertook that task. If it had, the District Court would have concluded that Aik Chuan was entitled, at a bare minimum, to receive the surplus in value of the Rockwood Plant over and above the Outstanding Indebtedness. *See supra* Section II.B.

## IV. THE DISTRICT COURT ERRED BY AWARDING AGF DAMAGES THAT INCLUDED UNRECOVERABLE INTEREST

### A. The Court's Interest Calculations Ignore That The Subordination Agreement Has No Interest Provision

Compounding its other legal errors, perhaps the District Court's most glaring and clear legal error below is that it improperly awarded AGF *more than $5.3 million* in interest damages that the plain language of the Subordination Agreement precludes as a matter of law.

As this Court has very clearly and consistently held, damages on a breach of contract claim "should put the plaintiff in the *same economic position* he would have occupied had the breaching party performed the contract." *Boyce v. Soundview Tech. Group, Inc.*, 464 F.3d 376, 384 (2d Cir. 2006) (emphasis added) (citation omitted). Such breach of contract damages "are computed at the time of the breach." *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 85 (2d Cir. 2021) (citation omitted). The time of the purported breach is when the loss is "fixed and determined" because that is when the "plaintiff was to be made whole." *Id.* at 85-86 (quoting *Simon v. Electrospace Corp.*, 269 N.E.2d 21, 26 (N.Y. 1971)). In other words, breach of contract damages cannot put the plaintiff in a *better position* than it would have been if the contract were performed. *See, e.g.*, *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 498 (2d Cir. 1995) (declining to award breach of contract damages that would place plaintiff in "better economic position than it would otherwise have occupied").

49

The sole claim brought by Kolmar below was for breach of the Subordination Agreement based on Aik Chuan's "failure" to assume the Financing Documents (as defined in the Subordination Agreement). JA26-27. Accordingly, had Aik Chuan assumed the Financing Documents ("the performance" Kolmar demanded), Kolmar's "economic position" would have been receiving a payment from Aik Chuan of $19,014,303, which was the Outstanding Indebtedness according to Kolmar's June 4, 2021 Notice of Default demand letter. JA2189; *Boyce*, 464 F.3d at 384-85; *Moreno-Godoy*, 7 F.4th at 85-86. Kolmar's damages for its breach claim are therefore necessarily capped at that sum, subject to only two potential types of interest: (a) any applicable interest available under the Subordination Agreement (the only contract that Kolmar alleges Aik Chuan breached); or (b) prejudgment interest set by New York statute.

As an initial matter, the Subordination Agreement does ***not*** contain any interest provision, much less one that provides that Kolmar is entitled to interest on the Outstanding Indebtedness that Aik Chuan agreed to assume if there is an Event of Default. Accordingly, the only type of interest that AGF could be entitled to here is prejudgment interest under New York law accruing at nine percent from the date of the notice of default (the date of the alleged breach) to the date that this Court entered final judgment. *See* N.Y. C.P.L.R. § 5001(a) ("Interest shall be recovered upon a sum awarded because of a breach of performance of a contract[.]"); N.Y.

C.P.L.R. § 5004(a) (identifying 9% per annum as New York's statutory rate of prejudgment interest). Straightforward math dictates that an alleged breach valued at $19,014,303 as of May 30, 2021 that accrues interest at nine percent is worth $23,382,839 as of the date of final judgment here (December 5, 2023) *or more than $5.3 million less* than the damages awarded by the Court in its final judgment. *See* JA254.

Instead, the Court took the $19,014,303 that was outstanding at the time of Aik Chuan's alleged breach of the Subordination Agreement and applied a 25% default interest rate found in the Loan Agreement to determine that Aik Chuan owed $28,494,451 as of November 16, 2021. JA242-43. That calculation, however, is erroneous on its face because, among other reasons, it places Kolmar in a better economic position than it would have been had Aik Chuan not purportedly breached the Subordination Agreement. *Boyce*, 464 F.3d at 384-85; *Moreno-Godoy*, 7 F.4th at 85-86; *Indu. Craft*, 47 F.3d at 498; *Ostano Commerzanstalt v. Telewide Systems, Inc.*, 794 F.2d 763, 766-68 (2d Cir. 1986); *Town & Country, Linen Corp. v. Ingenious Designs LLC*, No. 18-CV-5075, 2022 WL 2757643, at *12 (S.D.N.Y. July 14, 2022).

Any potential argument that the default interest rate under the Loan Agreement applied because Aik Chuan was required assume the Loan Agreement pursuant to the Subordination Agreement has no merit. Aik Chuan was not a

signatory to the Loan Agreement. JA2587-89. Moreover, if Aik Chuan had assumed the Loan Agreement as Kolmar claimed it should have, all of Global Energy's debt to Kolmar would have been extinguished and Aik Chuan would have stepped into Kolmar's shoes as Global Energy's lender. *See generally* JA2826-44. Accordingly, in that "non-breaching" scenario, any outstanding debt payments by Global Energy under the Loan Agreement (and all applicable interest) would have flowed to *Aik Chuan*, not AGF whose loan Aik Chuan would have fully paid down. Because Kolmar's damages for any alleged breach of the Subordination Agreement are calculated at the time of the breach, and the Subordination Agreement does not provide for any interest apart from the statutory pre-judgement interest percentage under New York law, the District Court's damages calculation constitutes reversible legal error. *Boyce*, 464 F.3d at 384-85; *Moreno-Godoy*, 7 F.4th at 85-86; *Indu. Craft*, 47 F.3d at 498; *Ostano*, 794 F.2d at 766-68; *Town & Country*, 2022 WL 2757643, at *12.

## B. The Court Improperly Applied The Loan Agreement's Interest Provisions To The Kicker Fee

Even if the Court were to apply the Loan Agreement's interest provisions to the $19,014,303 Kolmar demanded in its notice of default (and it should not for the reasons set forth above), the Court's final judgment would *still* overstate Kolmar's maximum recovery by a similar (but slightly larger) magnitude. This is because, under the plain language of the Loan Agreement, only the ***principal amount*** of the

52

loan accrues interest. In its December 4, 2023 Memorandum and Opinion ("Order on Aik Chuan's Objection"), the District Court held that "[t]he Loan Agreement included the requirement that the borrower pay a 70% kicker fee, and that the Loan Agreement's interest calculations would be applied to an amount that included that fee." JA250. The District Court did not cite a single provision in the Loan Agreement to establish that the kicker fee accrues interest. And with good reason; there is no such provision.

In fact, the plain language of the Loan Agreement confirms the District Court's plain error in calculating interest. The kicker fee is identified in the Loan Agreement as the "Repayment Amount" which is specifically defined as "with respect to any repayment of the Note (whether upon conversion, at maturity, upon acceleration or otherwise), an amount equal to 170% of the outstanding principal amount of the Note." JA2527. The total outstanding principal amount under the Loan Agreement as of June 4, 2021 was $10,450,000. *See, e.g.*, JA2878. Thus, the Repayment Amount (i.e. kicker fee) is $7,315,000. JA2527; JA2878. Nothing within the definition of Repayment Amount states that interest either applied to, or is included within, the amount specified.

Section 2.4(a) of the Loan Agreement, which pertains to interest, further confirms that interest only applies to the ***outstanding principal*** amount of the loan:

> Interest Rate. Subject to Section 13.15 [pertaining to usury law], the ***outstanding principal amount of the Loans*** shall

> bear interest at a rate per annum equal to the Applicable
> Interest Rate [i.e. 12%], provided that upon the occurrence
> of any Event of Default and for so long as it is continuing,
> the ***outstanding principal amount of the Loans*** shall bear
> interest at a rate equal to the Default Rate [i.e. 25%].

JA2533 (emphasis added). The Repayment Amount is not referenced anywhere within this interest provision. *Id.*

The Repayment Amount is also separately described from the principal amount in other Sections of the Loan Agreement as well. *See, e.g.*, JA2693 (defining the principal amount as $7,950,000 (the original loan amount) and identifying the Repayment Amount as separate from the principal amount) ("FOR VALUE RECEIVED, the undersigned … unconditionally promises to pay … the principal amount not to exceed Seven Million Nine Hundred Fifty Thousand and No/100 US Dollars ($7,950,000.00) ***plus accrued interest and the Repayment Amount*** as described in the Loan Agreement[.]" (emphasis added))). In short, there is no record evidence supporting Kolmar's contention that the Repayment Amount should be added to the outstanding principal amount of the loan to calculate interest.

In its Order on Aik Chuan's Objection, the Court held that Aik Chuan waived any argument about how the interest on the Outstanding Indebtedness is calculated. For support, the Court cites *Brown v. City of New York*, 862 F.3d 182, 187 (2d Cir. 2017) for the proposition that if a party fails to raise an argument at trial "it may properly be deemed waived." JA250. But Aik Chuan ***did*** object on foundation

grounds, repeatedly, to the conclusory and unsupported damages figure in Mr. Luddy's declaration. *See*, JA333 at 79:1-21; JA488 at 234:6-13; JA695-97 at 441:1-443:22; JA718 at 464:1-8; JA760 at 506:2-25. The Court overruled those objections, which means not only that Aik Chuan did not waive its arguments regarding Kolmar's damages, but also that there is nothing in the record that supports Kolmar's damages calculations, including its inclusion of the kicker fee accruing interest.

It was *Kolmar's* burden of proof to provide evidentiary support for its damages calculation for the Court to rely upon, not Aik Chuan's burden to show why Kolmar's damages calculations are wrong. Neither Kolmar's findings of fact, conclusions of law, or trial testimony support Kolmar's method of damages calculation with respect to the kicker fee. Instead, the *only* mention in the record of Kolmar's damages generally is the last sentence of Kevin Luddy's direct testimony affidavit stating that "as of today Aik Chuan owes $27,929,634" without any further elaboration and for which, again, Aik Chuan objected to as lacking foundation. JA3856; JA333 at 79:1-21.

In its Order on Aik Chuan's Objection, the Court stated that "[i]n its brief cross examination [of Kevin Luddy] on this issue, Aik Chuan did not question the application of interest to the 70% kicker fee." JA250-51. But Kolmar did not enter any evidence at trial regarding any aspect of Kolmar's damages calculation, including its treatment of the kicker fee for interest purposes. This is a critical point

because Aik Chuan could not waive an objection to a calculation or spreadsheet that Kolmar never offered into evidence in the first place. Had Kolmar actually offered evidence to explain its method for calculating its damages, Aik Chuan would have spotted the clear error of including the kicker fee to determine the interest accrued and objected (again) to Kolmar's stated damages as lacking foundation. But the practical effect of Kolmar never offering its damages calculations into evidence is the same as it would have been if Kolmar offered those calculations and the Court sustained Aik Chuan's objection; namely, there is *zero* record evidence to support Kolmar's calculations at all, much less with respect to the kicker fee allegedly accruing interest. The District Court's interest calculations therefore lack evidentiary support with respect to the kicker fee and that part of the District Court's judgment cannot withstand this Court's *de novo* review.

Although Kolmar referenced some discussion of damages during its summation: (1) that discussion also did not offer any rationale for why the kicker fee should be added to the principal amount of the loan to calculate interest; and (2) summations are not substantive evidence. *See, e.g.*, *United States v. Jordan*, 591 F. Supp. 2d 686, 719 (S.D.N.Y. 2008) (Cote, J.) ("anything said by counsel—for example, in … closing arguments—was *not* evidence." (emphasis in original)); *Wallace v. Suffolk Cnty. Police Dep't*, 809 F. Supp. 2d 73, 83 (E.D.N.Y. 2011)

(rejecting explanation for proximate cause provided during summation because summations are not evidence).

If the Court were to affirm the District Court's conclusion that the Loan Agreement's interest provisions (in an agreement that Aik Chuan never signed) should be used to calculate interest here, Aik Chuan's maximum liability would be $22,598,189 as of December 5, 2023 *or more than $6.1 million less* than the damages awarded by the Court in its final judgment. The math behind that figure is based on the outstanding amount owed being $11,699,303 as of May 30, 2021 (i.e. a $10,450,000 principal loan amount plus $1,249,303 in interest accrued through that date). JA2878. Twelve percent interest (the Applicable Interest Rate under the Loan Agreement) on the outstanding amount as of May 30, 2021 through the final judgment date (December 5, 2023) is $3,583,886. Added to the amount owed as of May 30, 2021, the total principal and interest is $15,283,189. The kicker fee ($7,315,000), which does not accrue interest, should then be added to that total principal and interest amount and results in a maximum liability figure of $22,598,189.

Finally, it was also clear error for the District Court to use the Default Rate (i.e. 25%), which applies under Section 2.4(a) of the Loan Agreement only "for so long as [the Event of Default] is continuing." *See* JA2533. The District Court should not have applied the Default Rate for two reasons.

*First*, once Kolmar exercised its foreclosure remedies, there could no longer be a "continuing" default because Kolmar seized the only assets securing the loan (the Rockwood Plant) and the only assets Global Energy had to generate revenue to repay the loan. In short, the business relationship was over. Without a "continuing" business relationship there could not be "continuing" default by Global Energy.

*Second*, the sole Event of Default Kolmar relied upon at trial (and that the District Court solely relied upon in its Opinion) was Global Energy missing a contractual deadline for Verification (as defined in the Loan Agreement) of Module 2 at the Rockwood Plant. That was a one-time alleged default that occurred in May 2021 that Kolmar described as incurable. JA2189 (stating that there is "no cure" for breach of the Verification requirement). A single missed deadline is not an ongoing or "continuing" failure to perform. Accordingly, if any interest rate under the Loan Agreement applies here, it is the Applicable Interest Rate (i.e. 12%), not the Default Rate (i.e. 25%) that the Court used to calculate Kolmar's damages.[10]

---

[10]  Even assuming the Default Rate applied (which it does not), using the same math as the 12% Applicable Interest Rate described above (but just using the 25% Default Rate instead), the total damages should be $26,480,733 as of December 5, 2023 without the inclusion of the kicker fee in the interest calculation.

## CONCLUSION

For the foregoing reasons, Aik Chuan respectfully requests that this Court reverse the District Court's Final Judgment below and remand for further proceedings to correct the legal errors identified above.

Dated: August 1, 2024

Melissa Brown
ARNOLD & PORTER
  KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
melissa.brown@arnoldporter.com

Respectfully submitted,

*/s/ John F. Hagan, Jr.*

John F. Hagan, Jr.
Mark J. Samartino
ARNOLD & PORTER
  KAYE SCHOLER LLP
70 West Madison, Suite 4200
Chicago, IL 60602
(312) 583-2300
john.hagan@arnoldporter.com

*Counsel for Appellant Aik Chuan Construction Pte. Ltd.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 13,879 words in this brief.

*/s/ John F. Hagan, Jr.*
John F. Hagan, Jr.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically on August 1, 2024 and will, therefore, be served electronically upon all counsel.

*/s/ John F. Hagan, Jr.*
John F. Hagan, Jr.

**SPECIAL APPENDIX**

## SPECIAL APPENDIX INDEX

Opinion and Order,
    Dist. Ct. Dkt. 141 (Nov. 20, 2023) ................................................. SA1

Order,
    Dist. Ct. Dkt. 142 (Nov. 20, 2023) ................................................SA60

Order,
    Dist. Ct. Dkt. 151 (Dec. 4, 2023).................................................SA62

Memorandum Opinion & Order,
    Dist. Ct. Dkt. 152 (Dec. 4, 2023).................................................SA64

Final Judgment,
    Dist. Ct. Dkt. 154 (Dec. 5, 2023).................................................SA69

Opinion & Order,
    Dist. Ct. Dkt. 176 (Mar. 20, 2024)................................................SA71

N.Y. C.P.L.R. § 5001 ......................................................................SA80

N.Y. C.P.L.R. § 5004 ......................................................................SA81

N.Y. U.C.C. § 9-604 ........................................................................SA82

N.Y. U.C.C. § 9-610 ........................................................................SA83

N.Y. U.C.C. § 9-615 ........................................................................SA84

N.Y. U.C.C. § 9-626 ........................................................................SA86

N.Y. U.C.C. § 9-627 ........................................................................SA87

Tenn. Code. Ann. § 35-5-117...........................................................SA88

Tenn. Code. Ann. § 47-9-604............................................................SA89

Tenn. Code. Ann. § 47-9-610............................................................SA90

Tenn. Code. Ann. § 47-9-615............................................................SA91

Tenn. Code. Ann. § 47-9-626............................................................SA93

Tenn. Code. Ann. § 47-9-627............................................................SA94

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
AMERICAN GREENFUELS ROCKWOOD            :
(TENNESSEE), LLC,                       :
                                        :
                     Plaintiff,         :
                                        :
           -v-                          :
                                        :
AIK CHUAN CONSTRUCTION PTE. LTD.,       :
                                        :
                     Defendant.         :
                                        :       21cv7680 (DLC)
   -------------------------------------:
                                        :       OPINION AND ORDER
AIK CHUAN CONSTRUCTION PTE. LTD.,       :
                                        :
           Counterclaim Plaintiff,      :
                                        :
           -v-                          :
                                        :
KOLMAR AMERICAS, INC. and AMERICAN      :
GREENFUELS ROCKWOOD (TENNESSEE), LLC,   :
                                        :
           Counterclaim Defendants.     :
                                        :
--------------------------------------- X

APPEARANCES:

For Plaintiff and Counterclaim Defendants:
John N. Thomas
Jenna Christine Hutchinson
Troutman Pepper Hamilton Sanders LLP
875 Third Avenue
New York, NY 10022

Leslie A. Davis
Jenna Noelle Tyrpak
Margaret Burnside
Troutman Pepper Hamilton Sanders LLP
401 9th Street, NW, Suite 1000
Washington, DC 20004

Sheila Zifu Chen

Troutman Pepper Hamilton Sanders LLP
5 Park Plaza, Suite 1400
Irvine, CA 92614

For Defendant and Counterclaim Plaintiff:
John F. Hagan, Jr.
Mark J. Samartino
Cameron Davis
Arnold & Porter Kay Scholer LLP
70 West Madison Street, Suite 4200
Chicago, IL 60602

Melissa A. Brown
Arnold & Porter Kay Scholer LLP
250 West 55th Street
New York, NY 10019

DENISE COTE, District Judge:

This action arises out of a failed project to develop a renewable diesel energy plant in Rockwood, Tennessee. Nonparty Global Energy purchased the partially constructed plant from the defendant Aik Chuan Construction Pte. Ltd. ("Aik Chuan") in March 2020. Global Energy simultaneously obtained a bridge loan from the plaintiff American GreenFuels Rockwood (Tennessee), LLC ("GreenFuels"). The bridge loan was intended to provide Global Energy with enough funding to complete the initial validation phase of the manufacturing process while Global Energy worked to find an investor to fund the construction of the remainder of the plant. Global Energy had issued promissory notes to Aik Chuan to purchase the plant and Aik Chuan agreed to subordinate some of that debt to the GreenFuels bridge loan and to assume Global Energy's obligations to GreenFuels in the event Global

2

Energy defaulted on the bridge loan.  Global Energy defaulted in May 2021 and Aik Chuan declined to assume the GreenFuels' bridge loan.  In July 2021, GreenFuels bought the plant at a foreclosure sale.

In this action, GreenFuels brings a claim against Aik Chuan for breach of the subordination agreement for failing to pay the outstanding amount due on the bridge loan following the foreclosure sale.  Aik Chuan has brought counterclaims against GreenFuels and its parent company, Kolmar Americas, Inc. ("Kolmar"), alleging that the counterclaim defendants deliberately induced a default and also conducted a commercially unreasonable foreclosure sale.[1]

This Opinion contains the Court's findings of fact and conclusions of law following a bench trial held between November 13 and November 16, 2023.  For the following reasons, judgment is granted to GreenFuels on its breach of contract claim and to the counterclaim defendants on Aik Chuan's counterclaims.

---

[1] Kolmar created GreenFuels, a limited liability company whose sole member is Kolmar, to act as the lender for the bridge loan. The names "GreenFuels" and "Kolmar" are used interchangeably, unless otherwise noted.

### Findings of Fact[2]

Aik Chuan is a Singapore company that operates in a diverse set of industries ranging from music to hospitality to construction.  Through its involvement in a horse racing club, it became interested in the conversion of biomass to electricity.  Through its investigation of that technology, it discovered Proton Power Inc. ("Proton Power"), a Tennessee company.  In 2014, Aik Chuan entered into an agreement with Proton Power for the buildout of ten renewable diesel plants, the first one of which was located in Rockwood, Tennessee (the "Rockwood Plant" or "Site").  Proton Power had developed a technology to create diesel fuel through burning wood chips in a process known as pyrolysis.  The process used a Cellulose to Hydrogen Power or "CHyP" reactor.

The Rockwood Plant was designed to consist of "modules," with each module containing eight CHyP reactors.  The buildout of the Rockwood Plant initially focused on Module 1, which was intended for testing purposes only.  It was anticipated that the Rockwood Plant would ultimately consist of six or more commercial modules producing renewable diesel.

Proton Power encountered difficulties with the fuel conversion process and in particular the downstream process of

---

[2] The Court's findings of fact are primarily contained in this section but appear as well in the conclusions of law.

extracting the diesel fuel from the other byproducts created in the pyrolysis process.  Although Aik Chuan invested over $60 million in the venture over the course of six years, Proton Power failed to deliver a working diesel plant and Aik Chuan decided to sell the Rockwood Plant.  At the time of the sale, Proton Power had only constructed Module 1.

I.  The March 2020 Transaction

On March 30, 2020, Aik Chuan sold the Rockwood Plant to Global Energy Hold Co., LLC ("GE Hold") for two promissory notes, a warrant, and an upfront payment of $250,000.  An indirect subsidiary of GE Hold is Global Energy Rockwood, LLC ("GE Rockwood"), which is the company that operated the Rockwood Plant after it was purchased from Aik Chuan.  For ease of reference, the Court refers collectively to all the Global entities as "Global Energy."[3]

At the time of the sale, Module 1 had produced some gas that could be converted to renewable diesel, but the diesel separation system had not been fully constructed and could not handle a continuous flow from the reactors.  Global Energy knew it needed to complete construction of Module 2, which was

---

[3] GE Hold is part of a larger corporate family in which Global Energy, LLC ("GE Parent") owns GE Hold, GE Hold owns Global Energy Pledge Co. ("GE Pledge"), GE Pledge owns Global Energy Rockwood Borrower Co., LLC ("GE Borrower"), and GE Borrower owns GE Rockwood.  These entities were formed to purchase the Rockwood Plant.

intended to produce renewable diesel for sale, and to validate the commercial viability of the conversion process. With that validation in hand, it hoped to procure a partner to finance the construction of the complete Rockwood Plant. Therefore, with its purchase of the Rockwood Plant, Global Energy looked for an entity to finance Global Energy's completion of the construction and the commercial validation of Module 2. That entity was plaintiff GreenFuels.

GreenFuels is a subsidiary of Kolmar. Kolmar and its affiliates purchase and market petrochemicals, petroleum and gas products, biodiesel, and other renewable fuels around the world. Kolmar has subsidiary operations that are involved in trading and manufacturing these fuels. As part of its traditional business activities, Kolmar had entered into a contract with Global Energy to buy all of Global Energy's production of renewable diesel at the Rockwood Plant in the event that the site became commercially operational. This is referred to as an offtake agreement.

Kolmar's subsidiary GreenFuels was created to extend a bridge loan to Global Energy. This bridge loan was to be used by Global Energy to complete the construction of Module 2 and to verify the commercialization of the manufacturing process.

Thus, the three parties just mentioned -- Aik Chuan, Global
Energy, and GreenFuels -- had interlocking interests.  Aik Chuan
hoped that the Rockwood Plant would succeed so that Global
Energy would be able to pay off the promissory notes it had
issued to Aik Chuan.  Global Energy needed to complete
construction on Module 2 to demonstrate the commercial viability
of the technology, and it obtained financing from GreenFuels to
support that construction.  To support GreenFuels' loan to
Global Energy, Aik Chuan agreed to subordinate one of the
promissory notes Global Energy had issued to it and agreed as
well to assume Global Energy's debt to GreenFuels in the event
of a default.  These interlocking agreements are described next.

A.   The Promissory Notes

Aik Chuan sold the Rockwood Plant to Global Energy in
exchange for two promissory notes, which together were worth
approximately $85 million (the "Promissory Notes"), as well as a
warrant for Aik Chuan to purchase a 5% interest in GE Hold and a
payment of $250,000 at closing.  The Promissory Notes are
governed by New York law and consist of one promissory note
dated March 25, 2020 for a principal amount of $40,480,930.06
and a second promissory note dated March 27, 2020 for a
principal amount of $44,519,070.

The Promissory Notes have a maturity date of "the earlier of: (1) the date which is fifty-five (55) months following the date of this Note, and (2) the date that [Global Energy] . . . refinances all of its debt obligations" under a "Balance of Plant Loan Agreement." The "Balance of Plant Loan Agreement" means a "loan agreement to be entered into by [Global Energy] to finance the balance of plant construction, which loan it intends to incur promptly following the successful completion of performance tests [on Module 2]." Aik Chuan therefore maintained a significant financial interest in the success of the Rockwood Plant by virtue of its equity warrant rights and the Promissory Notes.

B.   The Loan Agreement

On March 30, Global Energy also entered into a loan agreement with GreenFuels as lender (the "Loan Agreement"). The Loan Agreement is also governed by New York law. Under the Loan Agreement, GreenFuels agreed to extend a loan to Global Energy in the principal amount of $7.95 million, with 170% of the outstanding principal due at maturity (the "GreenFuels Loan"). The GreenFuels Loan also included a base interest rate of 12% per annum, and "upon the occurrence of any Event of Default and for so long as it is continuing" was subject to a default interest rate of 25% on the "the outstanding principal amount."

The GreenFuels Loan was to be used to fund the construction and operation of Module 2.  The Loan Agreement provided that the loan was to be used solely:

> (i) in an aggregate amount not to exceed $250,000 towards financing the Acquisition, (ii) to fund the Account, which funds shall subsequently be applied to pay solely the Project Costs in accordance with the Project Schedule and the Project Budget and (iii) to pay transaction costs and expenses incurred in connection with the consummation of the transactions contemplated by the Operative Documents on the Closing Date.

The "Acquisition" refers to Global Energy's purchase of the Rockwood Plant from Aik Chuan.  "Project" is defined as "the ownership, construction and operation of Module II" at the Rockwood Plant.

The Loan Agreement contains two provisions of particular significance to this dispute:  Global Energy's duties (a) to maintain liquidity of at least $50,000 and (b) to succeed by May 31, 2021, in verifying that the performance of Module 2 had met identified operating standards.  Article 8, the "Events of Default," provides that:

> The occurrence of any of the following events shall constitute an event of default (individually, an "Event of Default", and collectively, "Events of Default") hereunder: . . .
>
> > 8.7 Breach of Terms of Agreement. (a) Borrower shall fail to perform or observe any of the covenants set forth in . . . Article 6 . . .

> 8.8 Verification. The Verification Date shall
> not have occurred on or prior to the Target
> Verification Date.

Article 6.26 provides that Global Energy will not, without the

prior written consent of GreenFuels, "permit Liquidity at any

time to be less than $50,000" (the "Liquidity Provision").

The Loan Agreement defines the requirements and terms

related to the verification provision in Article 8 (the

"Verification Provision"), as follows:

- "Verification Date" means "the date upon which
  Verification has occurred, as determined by [GreenFuels],
  in consultation with the ESA Contractor and/or SSA
  Contractor, pursuant to a written notice delivered to
  [Global Energy] immediately following the completion of
  the successful Verification Test."

- "Verification" means "that Module II has successfully met
  the Verification Testing Criteria set forth on Exhibit B
  of [the Loan] Agreement."

- Exhibit B provides that "Module II will be deemed fully
  meeting lender requirements when such module operates and
  delivers 75% of Design Capacity . . . when operated in
  Standard Operating Mode . . . for any consecutive thirty
  (30) day period. The testing of the Module II will be
  performed by parties selected by Borrower, in
  consultation with Lender."

- "Design Capacity" is defined in Exhibit B as the
  production of 87,120 gallons of renewable diesel fuel in
  30 days.

- "Standard Operating Mode" is defined in Exhibit B as
  "continuous, 24/7, operation whereby all CHyP Units are
  operating at all times."

(emphasis added).

Pursuant to Article 1.1 of the Loan Agreement, the Target Verification Date was May 31, 2020. The Parties agree that the year is a typographical error, and the actual Target Verification Date was May 31, 2021.

The Loan Agreement has a maturity date of "the earlier to occur of (a) the date that is the eighteen (18) month anniversary of the Closing Date, (b) such earlier date on which the entire outstanding principal balance of the Loans, together with all unpaid interest, fees, charges and costs, become due and payable under the Agreement, and (c) the date Borrower enters into a Qualified Financing" for the completion of the Rockwood Plant. Pursuant to Article 2.2,

> the obligation to pay, satisfy, perform and otherwise discharge all other Obligations, as and <u>when they become due</u>, are the joint and several obligations of [Global Energy] Parent and Borrower Co., and <u>Lender shall have the right at any time to look to either [Global Energy] Parent or Borrower Co., or both of them, or to the Collateral pledged by them and the other Credit Parties, as it may determine in its sole discretion, for satisfaction of those obligations</u>.

(emphasis added). "Collateral" means "all real and personal property and intangibles, and proceeds of each of the foregoing, that is owned from time to time by any Credit Party."

Article 9 provides that upon the occurrence of an Event of Default under the Loan Agreement, GreenFuels "may, without

further notice of default . . . exercise any or all of the following rights and remedies, in any combination or order that Lender may elect" including "9.3 Acceleration" and "9.6 Remedies Under Financing Documents."  Article 9.3, "Acceleration," allows GreenFuels to:

> <u>Declare and make all sums of accrued and outstanding principal</u> (and the Repayment Amount payable with respect thereto) <u>and accrued but unpaid interest</u> remaining under this Agreement, together with all unpaid fees, any applicable prepayment premium, costs, charges and other amounts due hereunder or under any other Financing Document, <u>immediately due and payable</u>, provided that in the event of an Event of Default occurring under Section 8.4, all such amounts shall become immediately due and payable without further act of Lender or any other Person.

(emphasis added).

The remedies upon a default included the right to foreclose on the "Collateral."  Article 9.6, "Remedies Under Financing Documents," allows GreenFuels to:

> Without being limited by any of the foregoing, <u>exercise any and all rights and remedies available</u> to it under any of the Financing Documents, <u>including judicial or non-judicial foreclosure</u> or public or private sale <u>of any of the Collateral</u> . . . .

(emphasis added).

In addition, Article 11 of the Loan Agreement contains a waiver provision.  It provides that the lender's rights are not waived by, among other things, a delay in enforcing those rights.  It states, in part:

12

> No failure or delay by Lender in exercising any right
> or power hereunder or under any other Financing
> Document shall operate as a waiver thereof, nor shall
> any single or partial exercise of any such right or
> power, or any abandonment or discontinuance of steps
> to enforce such a right or power, preclude any other
> or further exercise thereof or the exercise of any
> other right or power.

(emphasis added).

C.   The Security Agreement and the Deed of Trust

At the time it executed the Loan Agreement, Global Energy executed with GreenFuels (as lender) a Pledge and Security Agreement (the "Security Agreement") and GE Rockwood executed with GreenFuels (as beneficiary) a Credit Line Deed of Trust (the "Deed of Trust"). The Security Agreement secured as collateral the personal property at the Rockwood Plant, including the equipment and technology, pursuant to Articles 8 and 9 of the Uniform Commercial Code ("UCC"). The Deed of Trust secured the real and tangible property at the Rockwood Plant as collateral for the GreenFuels Loan. Both contracts contain a New York choice of law provision.

Section 9.3 of the Security Agreement permitted GreenFuels, upon an Event of Default under the Loan Agreement, to conduct a sale of the personal property at the Rockwood Plant "to the extent permitted by applicable Law . . . which sale may be conducted by an employee or representative of [GreenFuels], and any such sale shall be considered or deemed to be a sale made in

a commercially reasonable manner."  It further provided that
"[i]n the event Lender shall bid at any foreclosure or trustee's
sale or at any private sale permitted by Law, this Agreement or
any other Financing Document, Lender may bid all or less than
the amount of the Secured Obligations."  The proceeds of any
foreclosure sale were required to be applied against any
Outstanding Indebtedness under the Loan Agreement.  The Security
Agreement also contained a waiver provision, whereby Global
Energy waived "all rights and remedies of a debtor or grantor
under the UCC or other applicable Law, and all formalities
prescribed by Law relative to the sale or disposition of the
Collateral."

The Deed of Trust irrevocably grants in trust, for the
benefit of GreenFuels:

> ALL of Trustor's right, title and interest <u>in the Land</u>
> . . .
>
> <u>TOGETHER WITH</u> all estate, right, title and interest of
> <u>Trustor in and to all such tangible property</u> now owned
> or hereafter acquired by Trustor (including all
> machinery, apparatus, equipment, materials, supplies,
> fittings and articles of personal property) and now or
> hereafter located on or at or attached to, or used in
> connection with the Real Estate <u>or any of the</u>
> <u>Improvements that are or are to become fixtures</u>.

(emphasis added).  The Deed of Trust provides that, in an Event
of Default under the Loan Agreement, GreenFuels may "enter into
and take possession of the Deed of Trust Estate" and "cause the

14

Trustee to sell the Deed of Trust Estate."  The Trustee was
given the power "to sell Deed of Trust Estate and property
subject hereto in accordance with the laws of the State of
Tennessee."

    D.   The Subordination Agreement

    Finally, pursuant to a subordination agreement between Aik
Chuan, GE Hold, and GreenFuels (the "Subordination Agreement"),
Aik Chuan agreed to subordinate one of the Promissory Notes to
the GreenFuels Loan and to assume Global Energy's obligations to
repay GreenFuels in the event of a default.  The Subordination
Agreement is also governed by the law of the State of New York.

    Section 8.2 of the Subordination Agreement describes the
requirement that GreenFuels provide a notice of default to Aik
Chuan.  It provides that:

> if an Event of Default occurs . . . under any of the
> Financing Documents (as defined in the Loan Agreement)
> which Lender is not willing to waive, Lender shall
> promptly provide the Subordinated Creditor [Aik Chuan]
> with written notice thereof . . . which . . . shall
> include an accounting of the outstanding amount of the
> indebtedness under the Financing Documents as of such
> date (the "Outstanding Indebtedness").  Lender agrees
> that it shall not exercise any of its rights or
> remedies . . . in connection with such Event of
> Default without first providing not fewer than five
> (5) Business Days' notice to [Aik Chuan] ("Remedies
> Notice").

(emphasis added).

15

Upon issuance of the Remedies Notice, Aik Chuan was required to assume Global Energy's financial obligations to GreenFuels as set forth in the Financing Documents.   Section 8.2 provides that:

> Immediately upon Lender's issuance of the Remedies Notice, the Subordinated Creditor [Aik Chuan] will assume, and agrees it is obligated to assume, the Financing Documents from the Lender, and Lender agrees it will assign the Financing Documents to [Aik Chuan] in exchange for cash consideration in the amount of the Outstanding Indebtedness.

(emphasis added).   "Financing Documents" include, inter alia, the Loan Agreement, the Deed of Trust, and the Security Agreement.   Thus, upon an Event of Default and the receipt of a Remedies Notice, Aik Chuan was required to assume Global Energy's duty to pay GreenFuels the amounts owed under Article 9.3 of the Loan Agreement.

Before the execution of the Subordination Agreement, Global Energy's CEO Greg Smith emailed Aik Chuan to emphasize the significance of Section 8.2.   Smith explained: "Essentially, If Global Energy defaults during the Trial Phase construction, Aik Chuan will pay off the Trial Phase lender and become Senior secured over all of the Rockwood Assets."   Singapore Counsel for Aik Chuan responded that Aik Chuan was "fine with the proposed amendments."   Aik Chuan understood that, in the event of a

default by Global Energy, Aik Chuan had to pay GreenFuels
whatever it was owed under the Loan Agreement.

In the Subordination Agreement, Aik Chuan also waived its
right to assert certain claims and defenses.  It provides:

> the Subordinated Creditor [Aik Chuan], for itself and
> its parent, subsidiaries, affiliated related companies
> . . . hereby releases and waives, and agrees and
> covenants that it will not . . . directly or
> indirectly assert, commence or make any allegation . .
> . in Law or in equity . . . based on, arising out of
> relating to equitable subordination, breach of
> fiduciary duty, conflict of interest, affiliated or
> related party transaction, lender liability,
> unfairness, unclean hands or similar matter in
> relation to the Loans or any payment.

(emphasis added).

II.  Global Energy's Operation of the Rockwood Plant

Following its purchase of the Rockwood Plant, Global Energy
focused its efforts on the construction of Module 2.  It
retained USP&E, a third-party contractor, to help operate and
maintain the Rockwood Plant.  Within months, Global Energy
required additional capital in order to commercialize Module 2
and GreenFuels agreed to provide it.  The Loan Agreement and the
Subordination Agreement were amended to reflect additional loans
that GreenFuels extended to Global Energy on November 20, 2020;
March 1, 2021; and April 21, 2021.  Ultimately, GreenFuels
provided over $10 million to Global Energy through this bridge
loan.

17

SA17                    SA17                    SA17

Global Energy initially targeted the fall of 2020 for the 30-day Verification Test to occur. Global Energy did not meet this goal. Indeed, the construction of Module 2 was not even completed until the end of the year. Following the module's construction, Global Energy encountered more serious problems and delays. Although the reactors appeared to work, it was unclear whether any sizeable quantity of renewable diesel fuel could be produced through Module 2, much less whether the Rockwood Plant could be made commercially viable.

One of the problems related to the software used to control Module 2's operations. The software that had been used to run Module 1 could not be used to run Module 2. If the software did not work, Module 2 had to be run in "manual mode." But in manual mode, the machinery and process could not operate on a continuous 24/7 basis, as required for Verification.

There were also problems with the mechanical system for feeding the wood supply into the reactors, or infeed system, and with the corkscrew-like augers used to push material through the system. Any time these parts broke or failed there was more "downtime." It was also dangerous to operate the Rockwood Plant because, due to a host of defects, oxygen would leak into the system and create an unacceptable risk of explosion.

18

The most challenging problem with Module 2, however, was tarring.  Tar was produced from the CHyP reactors as part of the pyrolysis process and would build up in the pipes and gears. The build-up restricted the flow of the diesel and other byproducts through the module.  The reactors needed to be shut down in order to clean away the tar.  The time the module was shut down for cleaning or repairs reduced the amount of "uptime"[4] and thus the amount of diesel the module was able to produce. As a result of these and other problems, attempts to run Module 2 continuously during the spring of 2021 failed.

Several of the problems with Module 2 required the use of spare or replacement parts.  USP&E used parts from Module 1 as replacement parts.  As a result, Module 1 was dismantled and used only for the harvesting of parts.  Not all of the Module 1 replacement components, however, were compatible with Module 2 and this resulted in additional delays.

On April 13 and 14, 2021, Kolmar's David Astrauckas met with Greg Smith of Global Energy and a representative of Proton Power at the Rockwood Plant (the "April 2021 Meeting").  This was the first visit by Astrauckas to the Plant since the start of the pandemic.  Before this time, Kolmar had depended largely

---

[4] Under the Verification Testing Criteria, the Rockwood Plant had an operating rate objective of 75%.

on Smith for reports about the Plant's operations and problems.
During the spring of 2021, Module 2 had been operating, on
average, less than 10% of the time.

At the April 2021 Meeting, Astrauckas sought to understand
the key issues and to see how Kolmar could support Global Energy
in completing the project.  The parties discussed the tarring
issue and other problems.  The parties also discussed a
workaround for the tarring issue through the creation of a
network of parallel piping.  Proton Power agreed to build and
install the new piping.  The additional piping was intended to
allow the flow of material through the module to be diverted
while the main piping was closed off and cleaned.  Once cleaned,
the main piping within Module 2 would be reopened.  Global
Energy hoped and expected that this solution would enable Module
2 to run continuously.  No one, however, expected that this
solution could be put in place within a matter of a few weeks.
Smith hoped that the installation would be completed by mid-June
2021.  At no time during the April 2021 Meeting did the parties
discuss changing the terms of the Loan Agreement or the
Verification Date.

Thus, due to myriad delays and difficulties, Module 2 was
not ready to operate continuously by the beginning of May 2021
and the Verification Test required by the Loan Agreement could

20

SA20                         SA20                         SA20

not commence.  The Verification Test is a 30-day test that would have to be initiated no later than May 1 in order to conclude by the Target Verification Date of May 31, 2021.  It is undisputed that the Rockwood Plant could not have achieved Verification by the Verification Date as the manufacturing problems prevented it from running continuously (or safely), much less from operating and delivering "75% of Design Capacity," as required by the Loan Agreement.

Nor did Global Energy have the money it needed to fix these problems.  As of May 2021, Global Energy had run out of money.  During May, the USP&E workforce walked of the job because it was not being paid.  Module 2 did not operate after the workforce left the site because there was insufficient staff to conduct operations.  Additional funding was also needed to buy the piping and other equipment necessary for the Plant, as well as the woodchips or feedstock that would be fed into the module.

By early May 2021, Kolmar had concluded several things.  Kolmar still believed in the technology and wanted the Rockwood Plant to succeed; it still hoped to benefit from its offtake agreement.  It also knew that Module 2 was at an "anemic" rate of production and that Global Energy required additional working capital to achieve commercialization.  Kolmar, however, did not want to invest any more money into that effort and wanted its

21

bridge loan repaid.  Kolmar had also lost confidence in Global
Energy and believed that the Plant needed more professional
management if it were to succeed.  Kolmar considered two courses
of action.  It decided to declare a default, require Aik Chuan
to assume the Loan Agreement debt and repay the bridge loan.  If
Aik Chuan refused to do so, GreenFuels would enforce its rights
under the Financing Documents, proceed to foreclosure, and if it
purchased the Rockwood Plant in the foreclosure, bring in more
professional management.  It was confident that it could procure
financing to complete the expansion of the Plant if it could
demonstrate the commercial viability of the manufacturing
process.  It projected the profitability of the Plant as
extraordinary if the technology and manufacturing process
actually worked.

     On May 4, Kolmar informed Aik Chuan and Global Energy of
its plan to declare a default and require Aik Chuan to pay off
the GreenFuels Loan.  It proposed, however, that Aik Chuan fund
Global Energy's current capital requirements, which it estimated
to be $3.5 million.  If Aik Chuan were willing to do so, Kolmar
said it would "work with you to determine how long we will defer
the Notice of Default for."  Aik Chuan did not respond to this
letter.

Meanwhile, knowing that it needed more money to continue
its work at the Rockwood Plant, on May 5 or 6, Global Energy
filed a claim under its Professional Liability and Pollution
Incident Liability insurance policy. The claim form reported
that "design issues prevent the system from operating on a
continuous basis." The claim identified six operational issues
and proposed potential solutions that Global Energy estimated
would cost between $3.43 million and $3.78 million to implement.
The claim was denied.

Having had no response to its May 4 letter, on June 2,
Kolmar sent Aik Chuan another letter proposing "a restructuring
plan that is an alternative to foreclosure on the Rockwood
assets." This letter proposed that Aik Chuan provide Global
Energy with $5 million by August 1, 2021. Kolmar requested a
response within 24 hours. This deadline was extended to June 4.
Executives from Kolmar and Aik Chuan exchanged WhatsApp messages
during this period, and Kolmar expressed its desire to
collaborate with Aik Chuan on a restructuring of the Global
Energy debt. It also offered to take over the management of the
project to ensure that Module 2 was completed and validated. It
hoped that its proposal would give both Kolmar and Aik Chuan the
best chance to recoup their investments.

23

Aik Chuan did not respond with favor to any of Kolmar's proposals or make a counterproposal.  It did not want to invest any more money in the project, having already invested tens of millions of dollars with no return in sight.  It was well informed about the problems at the Plant since it had an employee on site during this entire period of time.

III. Notice of Default

On June 3, 2021, GreenFuels sent a "Notice of Events of Default under the Loan Agreement" to Global Energy.  The Notice identified two Events of Default, one of which was the failure to conclude the Verification Test.  It advised Global Energy that it would proceed to foreclosure.

The Notice stated, in relevant part:

> This letter is notice to Global that as of June 1, 2021, Global has committed at least two Events of Default under the Loan Agreement.

> First, an Event of Default occurred under Section 8.7 of the Loan Agreement.  Global breached Section 6.26 of the Loan Agreement when it broke its negative covenant to prohibit the balance in the Account to decrease below $50,000. . . .

> Second, an Event of Default occurred under Section 8.8 of the Loan Agreement.  The Verification Date did not occur prior to the Target Verification Date.  This [sic] is no cure for this breach.

> [GreenFuels] will now pursue any and all of the remedies available to it under the Loan Agreement . . . including non-judicial foreclosure and sale of the Collateral.

Also on June 3, GreenFuels sent notice to Aik Chuan of the
Events of Default in a "Loan Documents Default Notice as
required by the Subordination Agreement" (the "Default Notice").
GreenFuels cited Global Energy's failure to maintain a minimum
bank account balance of $50,000 and Global Energy's failure to
meet the Target Verification Date (together, the "Events of
Default").  The Default Notice stated that the "Outstanding
Indebtedness as of the date of this Loan Documents Default
Notice is US $19,014,303.00."  GreenFuels sent a second letter
to Aik Chuan on June 3 (the "Remedies Notice"), stating it would
"pursue and exercise any and all of the remedies available to it
under the Loan Agreement . . . against [Aik Chuan] and [Global
Energy] following the fifth Business Day from the date of this
Remedies Notice."  On June 4, Global Energy replied to Kolmar's
"Notice of Events of Default under the Loan Agreement" to remind
Kolmar that it could not initiate foreclosure proceedings "if
Aik Chuan assumes the financing documents."

Aik Chuan was advised by its corporate counsel and by
Global Energy that it was obligated to assume the GreenFuels
Loan or foreclosure would occur.  On June 7, Aik Chuan's
corporate counsel, who is based in Singapore and who had
negotiated the Subordination Agreement, told Aik Chuan:

> I have reviewed the relevant Subordination Agreement.
> Under clause 8.2, Aik Chuan must (it is not an option,

25

            but an obligation) assume the indebtedness under the
            loan documents if the lender issues the Remedies
            Notice to Aik Chuan. . . .

(emphasis in original).  None of the exchanges by Global Energy,

Aik Chuan, or their counsel, dispute that an Event of Default

had occurred or that Aik Chuan had any option but to assume

Global Energy's obligations under the Financing Documents.  They

do discuss, however, how to slow down the pace of events.

Global Energy advised Aik Chuan: "if Aik Chuan signs the

assignment and assumption agreement all actions stop which may

buy us more time."

        On June 10, Kolmar Group AG, which owns Kolmar, held a

board meeting.  The CEO of Kolmar outlined Kolmar's plan for the

Rockwood Plant.  He noted that the "easiest" route was to reach

a debt restructuring deal with Aik Chuan, but that Aik Chuan had

"not shown any constructive reaction to this proposal."  The

alternative plan was to achieve financial restructuring through

a foreclosure sale.  The foreclosure sale would either result in

a full repayment to Kolmar of the amount owed under the Loan

Agreement (if a third party bid above the Outstanding

Indebtedness) or in Kolmar's ownership of the Rockwood Plant.

        Also on June 10, Aik Chuan responded to the Default Notice.

It explained that the Default Notice was not valid since it did

not include "a detailed accounting of the Outstanding

26

Indebtedness."  On June 11, GreenFuels provided a more detailed calculation of the Outstanding Indebtedness amount.  In none of the many messages that executives of Aik Chuan and Kolmar exchanged over WhatsApp or by telephone during this period did Aik Chuan ever disagree that an Event of Default had occurred.

Also on June 11, counsel for GreenFuels informed Aik Chuan that it would be conducting a foreclosure sale "pursuant to the Deed of Trust" of the Rockwood Plant on July 9.  The letter included a copy of the foreclosure sale notice and informed the defendant that the notice "will appear in THE ROANE COUNTY NEWS on June 18 and 25, 2021, and July 2, 2021."  The attached foreclosure sale notice, discussed further below, stated that the foreclosure sale would apply to the "property located at 397 Black Hollow Road, Rockwood, Tennessee 37854" (the Rockwood Plant) as well as "all of the right, title and interest of Global Energy Rockwood, LLC, in and to any tangible personal property or fixtures located on the above described real property."  Counsel for GreenFuels also provided notice of the July 9 foreclosure sale to each of the Global Energy entities.

In the period before foreclosure, Smith attempted to find alternate financing for the Rockwood Plant.  On June 14, Smith sent Virtus Holding Ltd. a letter highlighting the Rockwood Plant as "a unique opportunity to purchase a renewable diesel

fuel production facility in various stages of completion, with one of six modules completed." Smith explained that Kolmar had scheduled a foreclosure on the Rockwood Plant since there was a "non-curable default" and Aik Chuan had not assumed Global Energy's debt to GreenFuels. He concluded his letter by explaining:

> The opportunity is to show up on July 9th and bid more than Kolmar and take the property. There will also be a need for $5MM in working capital to start the plant back up and get the facility running at 70% uptime to get to balance of plant funding. This should take about 90 days.

On June 23, Global Energy presented Aik Chuan with another strategy. It explained in this email that, because the parties had failed to stop the foreclosure by attempting to get a temporary restraining order, their remaining option was to "outbid Kolmar on the court house steps." Again, there was no suggestion that an Event of Default had not occurred. Indeed, Global Energy was highly critical of Proton Power for providing a system that was not "commercially viable."

On July 1, GreenFuels sent Aik Chuan another letter explaining that Aik Chuan was required to take immediate assignment of the GreenFuels Loan and warned that GreenFuels would proceed with the foreclosure sale if Aik Chuan did not. The letter stated:

28

> Following its receipt of the Remedies Notice on June
> 3, 2021, the terms of Section 8.2 of the Subordination
> Agreement "obligated" Aik Chuan Construction Pte. Ltd.
> ("AK") to "immediately" take assignment of the
> Financing Documents in exchange for the payment to
> [GreenFuels] of cash consideration in the amount of
> the Outstanding Indebtedness.
>
> As of the date of this letter, AK has not taken
> assignment of the Financing Documents . . . . If AK
> does not take assignment of the Financing Documents
> and make the payment of the amount of the Outstanding
> Indebtedness to [GreenFuels] by July 7, 2021, then
> [GreenFuels] will mitigate its damages by proceeding
> with the scheduled foreclosure sale.  AK will be
> responsible to [GreenFuels] for any difference between
> the Outstanding Indebtedness and the amount obtained
> at the foreclosure sale.

(emphasis added).

On July 6, Aik Chuan responded by complaining that the foreclosure sale was "on such a short timeline," prior to resolving a dispute regarding the amount of the Outstanding Indebtedness, and without an appropriate valuation.  Aik Chuan did not take assignment of the Financing Documents.

IV.  Foreclosure Sale

The foreclosure notice and terms of the sale were posted in the Roane County News, a local newspaper, on June 18, June 25, July 2, 2021 (the "Foreclosure Notice").  The Foreclosure Notice advertised the foreclosure sale as both a "Foreclosure Notice and UCC Sale," listed the Rockwood Plant's location and boundary lines, and noted that any "tangible personal property or fixtures" would also be sold.

29

Prior to the foreclosure sale, Kolmar's CFO, Kevin Luddy, engaged in discussions with various entities, including Deutsche Bank, Resilient Energi, Abundia/Proton Power, and Alleo regarding their interest in becoming involved with or purchasing the Rockwood Plant.  Luddy also authorized two of those entities to visit the Site before the foreclosure sale.  None of these entities chose to attend the foreclosure sale.

The foreclosure was held, as noticed, on July 9, 2021 (the "Foreclosure Sale").  Representatives from Aik Chuan and Proton Power attended the auction.  GreenFuels made an opening bid of $1.7 million during the sale.  No other bids were entered.  As the sole bidder at the auction, GreenFuels purchased the property for $1.7 million.  Luddy had authorized GreenFuels to bid up to the total Outstanding Indebtedness, and GreenFuels intended to accept any bid for the total Outstanding Indebtedness.

GreenFuels applied the proceeds from the Foreclosure Sale against the GreenFuels Loan, and on July 19, 2021, sent Aik Chuan a letter demanding approximately $17.5 million to satisfy the Outstanding Indebtedness of the GreenFuels Loan, with interest accruing daily.  Aik Chuan has not made any payment to GreenFuels.

## **Procedural History**

GreenFuels filed this action on September 14, 2021, bringing a breach of contract claim against Aik Chuan pursuant to the Subordination Agreement for the Outstanding Indebtedness due under the Loan Agreement.  Aik Chuan answered the complaint on January 13, 2022, asserting counterclaims against GreenFuels and Kolmar for breach of the Subordination Agreement and the implied covenant of good faith and fair dealing, tortious interference with a contract, and breach of fiduciary duty.

GreenFuels and Kolmar each filed a motion to dismiss Aik Chuan's counterclaims on March 21, 2022.  In response, Aik Chuan filed amended counterclaims on April 22.  On May 13, Kolmar submitted a motion to dismiss the counterclaims, and GreenFuels submitted a motion to dismiss the counterclaims and strike Aik Chuan's first through ninth affirmative defenses.  On August 17, the case was reassigned to this Court.

On September 30, 2022, the motions to dismiss were largely denied.  Am. GreenFuels Rockwood (Tennessee), LLC v. Aik Chuan Constr. Pte. Ltd., 21cv7680 (DLC), 2022 WL 4629255 (S.D.N.Y. Sept. 30, 2022).  The claims against Kolmar were dismissed except with respect to Aik Chuan's claim for tortious interference with a contract.  See id. at *4.  Aik Chuan's breach of fiduciary duty claim was dismissed as against both

31

counterclaim defendants.  See id. at *9.  The parties engaged in discovery in the following months.

On August 25, 2023, the Court placed the case on the November 13, 2023 trial ready calendar.  Aik Chuan filed its proposed findings of fact and conclusions of law on October 20; GreenFuels and Kolmar did so on October 21.  The parties submitted their joint pretrial order on October 21.  Pursuant to this Court's Individual Practices in Civil Cases regarding non-jury trials and without objection by the parties, the parties offered the direct testimony of their witnesses at trial by affidavit.  These affidavits, along with the documents constituting the parties' evidence in chief, were submitted with the parties' other pretrial materials on October 20 and 21.

GreenFuels presented direct testimony from four fact witnesses: Kevin Luddy, Executive Vice President and CFO for Kolmar and its subsidiaries; David Astrauckas, a Renewables Business Manager/Trader for Kolmar; Alan Jay, General Manager of the Rockwood Plant for USP&E until September 2021, and current General Manager for GreenFuels; and Shane Terry, Supervisor and later Foreman at the Site for USP&E until September 2021, and currently GreenFuels' Plant Superintendent at the Site.  Aik Chuan presented direct testimony through affidavit from four fact witnesses: Sai Tiong Leow, Business Development Director

32

for Aik Chuan; Patrick Leow, Vice President of Operations for
ACGR USA LLC, a subsidiary of Aik Chuan; Tick Hoong Hooi,
Country Manager for ACGR USA LLC and Plant Manager of the
Rockwood Plant from October 2016 through March 2020; and Greg
Smith[5], the former President and CEO of Global Energy.  Aik Chuan
also presented testimony by affidavit of its expert witness,
Marc Brown, a Partner at AlixPartners, a financial and
operational consulting firm, and GreenFuels presented the
testimony of its rebuttal expert, Daniel Van Vleet, a Partner
and Managing Principal of The Griffing Group, LLC, a business
valuation consulting firm.  Additionally, the parties presented
testimony by deposition of Michael DiProspero, who performed two
appraisals related to the Rockwood Plant on behalf of
GreenFuels, and Will Gruver, the founder and CEO of USP&E
Global, the company that provided operations and maintenance
services at the Rockwood Plant for Global Energy.

A bench trial commenced on November 13 and concluded on
November 16.  The affiants were cross-examined and counsel
presented their summation arguments.

---

[5] Aik Chuan agreed to pay all of Smith's fees and expenses
related to this litigation.

33

## Conclusions of Law

There are very few factual disputes between the parties.
Aik Chuan essentially raises only two defenses to GreenFuels'
breach of contract claim. The first is that GreenFuels itself
breached the Subordination Agreement when it declared an Event
of Default. The second is that the Foreclosure Sale was not
conducted in a commercially reasonable manner. GreenFuels
prevails on both issues and is entitled to the benefits of the
Subordination Agreement.

I.    Breach of Contract Claim Against Aik Chuan

GreenFuels asserts that Aik Chuan breached the
Subordination Agreement when Aik Chuan failed to assume the
Financing Documents from GreenFuels following its receipt of the
Remedies Notice. GreenFuels asserts that, as a result of this
breach, Aik Chuan is liable for Global Energy's Outstanding
Indebtedness.

Aik Chuan acknowledges that it had a contractual obligation
to assume the GreenFuels Loan in the event of a valid default
but asserts that it did not do so because no Event of Default
occurred. GreenFuels has shown that there was a valid Event of
Default under the Loan Agreement when Global Energy failed to
satisfy the Verification Provision of the GreenFuels Loan.[6]

---

[6] Because GreenFuels has succeeded in showing that an Event of
Default occurred on the basis of one of the two grounds on which

Accordingly, Aik Chuan breached the Subordination Agreement by failing to assume the Financing Documents and pay the Outstanding Indebtedness.

A.   Legal Standards

Both the Loan Agreement and the Subordination Agreement include a New York choice-of-law provision.  Under New York law, a plaintiff bringing a breach of contract claim "must prove: (1) the existence of a contract, (2) performance by the party seeking recovery, (3) nonperformance by the other party, and (4) damages attributable to the breach."  Moreno-Goody v. Kartagener, 7 F.4th 78, 85 (2d Cir. 2021) (citation omitted). The burden of proof on a breach of contract claim is on the party asserting breach.  Id.  Likewise, "[t]he party seeking to enforce a contractual obligation generally bears the burden of proof with respect to a condition precedent."  Rachmani Corp. v. 9 E 96th St. Apt. Corp., 629 N.Y.S.2d 382, 386 (1st Dep't 1995). Accordingly, the burden of proof to show that a Default occurred under the terms of the Loan Agreement and that Aik Chuan breached the Subordination Agreement is on GreenFuels.

The law that governs the construction of a contract is well settled.  Under New York law, a contract "that is complete,

_____

it gave notice, it is unnecessary to resolve whether Global Energy also triggered an Event of Default when it failed to maintain adequate liquidity.

35

clear and unambiguous on its face must be enforced according to
the plain meaning of its terms." Utica Mut. Ins. Co. v. Munich
Reinsurance Am., Inc., 7 F.4th 50, 56 (2d Cir. 2021) (citation
omitted).  Under New York law, a contract is unambiguous if its
language has "a definite and precise meaning, unattended by
danger of misconception in the purport of the contract itself,
and concerning which there is no reasonable basis for a
difference of opinion." Olin Corp. v. OneBeacon Am. Ins. Co.,
864 F.3d 130, 148 (2d Cir. 2017) (citation omitted).  "If the
terms of a contract are clear, courts must take care not to
alter or go beyond the express terms of the agreement, or to
impose obligations on the parties that are not mandated by the
unambiguous terms of the agreement itself." Steiner v. Lewmar,
Inc., 816 F.3d 26, 32 (2d Cir. 2016) (citation omitted); see
also Torres v. Walker, 356 F.3d 238, 245 (2d Cir. 2004)
(citation omitted) (applying New York law).

　　　　To determine whether disputed contract language is
ambiguous, a court must ask whether it is "ambiguous when read
in the context of the entire agreement." 32BJ N. Pension Fund
v. Nutrition Mgmt. Servs. Co., 935 F.3d 93, 100 (2d Cir. 2019)
(citation omitted); Law Debenture Tr. Co. of N.Y. v. Maverick
Tube Corp., 595 F.3d 458, 467 (2d Cir. 2010) (citation omitted)
(applying New York law).  "[W]here consideration of the contract

36

as a whole will remove the ambiguity created by a particular
clause, there is no ambiguity." Law Debenture Tr. Co., 595 F.3d
at 467 (citation omitted).  In interpreting contracts, "words
should be given the meanings ordinarily ascribed to them and
absurd results should be avoided." Mastrovincenzo v. City of
New York, 435 F.3d 78, 104 (2d Cir. 2006) (citation omitted)
(applying New York law).

     "[A] condition precedent is an act or event, other than a
lapse of time, which, unless the condition is excused, must
occur before a duty to perform a promise in the agreement
arises." Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg.
Cap., Inc., 821 F.3d 297, 305 (2d Cir. 2016) (citation omitted)
(applying New York law).  Under New York law, "express
conditions must be literally performed; substantial performance
will not suffice." In re Johns-Manville Corp., 759 F.3d 206,
214 (2d Cir. 2014) (citation omitted).

     "Under New York law, implicit in every contract is a
covenant of good faith and fair dealing which encompasses any
promises that a reasonable promisee would understand to be
included." JN Contemp. Art LLC v. Phillips Auctioneers LLC, 29
F.4th 118, 128 (2d Cir. 2022) (citation omitted).  This implied
covenant

          includes a promise that neither party to a contract
          shall do anything that has the effect of destroying or

37

     injuring the right of the other party to receive the
     fruits of the contract, or to violate the party's
     presumed intentions or reasonable expectations.

Id. (citation omitted).  As a corollary to the implied covenant

of good faith and fair dealing, "a party to a contract cannot

rely on the failure of another to perform a condition precedent

where he has frustrated or prevented the occurrence of the

condition."  Utica Mut. Ins. Co. v. Clearwater Ins. Co., 906

F.3d 12, 23 (2d Cir. 2018) (citation omitted) (applying New York

law).  Nevertheless, "under New York law, the implied covenant

of good faith and fair dealing cannot be used to impose an

obligation that is inconsistent with express contractual terms."

In Touch Concepts, Inc. v. Cellco P'ship, 788 F.3d 98, 102 (2d

Cir. 2015).

     Finally, under New York law, breach of the duty of good

faith and fair dealing "is merely a breach of the underlying

contract."  L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419,

434 n.17 (2d Cir. 2011) (citation omitted) (applying New York

law).  Thus, a claim for breach of the implied covenant of good

faith and fair dealing fails as redundant when both claims are

based on the same set of facts.  Id.

    B.  Application

        1.  Events of Default Under the Loan Agreement

     GreenFuels has proved that Global Energy failed to satisfy

the Verification Provision of the Loan Agreement.  The Loan

Agreement provides that an "Event of Default" has occurred if "[t]he Verification Date shall not have occurred on or prior to" May 31, 2021.  To meet the Verification Testing Criteria, Module 2 was required to operate and deliver "75% of Design Capacity" when operated in "Standard Operating Mode . . . for any consecutive thirty (30) day period."  Standard Operating Mode is "continuous, 24/7, operation."

The evidence establishes beyond any doubt that Module 2 did not and could not perform at the level required by the Loan Agreement as of May 31, 2021.  At no 30-day period prior to the Target Verification Date could Module 2 operate in Standard Operating Mode, much less achieve the 75% operating rate objective.  The Rockwood Plant faced a number of serious operating issues, the most complex of which was the tarring that prevented the module from operating continuously.  By April 2021, it was clear to all parties that significant additional time and money were required to alleviate the tarring issue and achieve continuous operation.  As a result, the Verification Provision of the Loan Agreement was not satisfied by May 31, 2021, and constituted a valid Event of Default.

Aik Chuan argues that GreenFuels failed to exercise good faith and fair dealing by manufacturing fictitious Events of

39

Default and that GreenFuels waived Global Energy's breach of the May 31, 2021 Verification Date. Aik Chuan's defenses fail.

To begin with, the Subordination Agreement's waiver clause bars Aik Chuan from asserting this defense. It provides, in pertinent part, that: "the Subordinated Creditor [Aik Chuan] . . . waives . . . any allegation . . . in Law or in equity . . . based on . . . unfairness, unclean hands or similar matter in relation to the Loans or any payment." The waiver provision in the Loan Agreement also states that "[n]o failure or delay by Lender in exercising any right or power hereunder or under any other Financing Document shall operate as a waiver thereof . . . ."

In any event, Aik Chuan's claim that GreenFuels was responsible for the default fails. This is a newly minted argument. It has been manufactured to evade contractual obligations. In none of their correspondence leading up to the Foreclosure Sale did Aik Chuan or Global Energy ever dispute that the failure to achieve Verification had occurred and that the failure constituted an Event of Default under the Loan Agreement. Indeed, in his June 23, 2021 email, which was sent after Aik Chuan had failed to assume Global Energy's Outstanding Indebtedness, Smith complained to Aik Chuan that Proton Power's failures had created "massive delays" that caused Global Energy

40

"to default under the loan" and that Aik Chuan and Global
Energy's only remaining options were to seek a TRO to stop the
Foreclosure Sale or to "outbid Kolmar on the courthouse steps."

Aik Chuan has suggested that GreenFuels should have
requested Global Energy to begin the Verification Test before
May 1, 2021, and that it cannot complain in good faith when
Global Energy did not.  Aik Chuan has not shown that GreenFuels
breached any duty by not suggesting that Global Energy begin a
futile and costly process.  The duty to conduct the Verification
Test rested on Global Energy.  And it is undisputed that Module
2 could not have passed that Verification Test.  Indeed, it was
dangerous to operate Module 2, it had never been operated
"continuously," and its ability to produce any significant
quantity of renewable diesel remained unproven.

Aik Chuan next asserts that GreenFuels agreed with Global
Energy to a detailed remedial plan at the April 2021 Meeting, a
plan that could not be completed for months, if it succeeded at
all.  Aik Chuan argues therefore, that GreenFuels either waived
the right to enforce the May 31 Verification Date or acted in
bad faith in declaring an Event of Default for failure to pass
the Verification Test.  Aik Chuan suggested as well in its
summation argument that that agreement "procured" the Event of
Default since there could be no Verification Test while the

41

parallel piping was being installed. This argument fails for
several reasons. While GreenFuels was aware from the April 2021
Meeting of the plan for the piping improvements, it was also
aware that any proposed fix would not be instantaneous and would
require additional capital. Proton Power's plan to create
parallel piping to permit the tar to be cleaned from Module 2
would have taken months to put in place. GreenFuels' knowledge
of that workaround plan, and its failure to object to it at the
April 2021 Meeting, did not waive any of its rights under the
Subordination Agreement and is not evidence that it breached its
duty of good faith under the Agreement. Moreover, as the Loan
Agreement explains in unambiguous terms, GreenFuels' rights are
not waived by any "failure or delay by [GreenFuels] in
exercising [those] right[s]."

In any event, GreenFuels did not engage in any delay in
exercising its rights under the agreements. It had already made
clear to Global Energy that it would not extend any further
bridge loan. It began giving notice to the interested parties
of its determination that there had been an Event of Default on
May 4, 2021, and repeated that notification in the weeks that
followed. During these weeks it tried to convince Aik Chuan to
give Global Energy the funds it desperately needed to pay its
workforce, buy more material, and repair Module 2. Aik Chuan

refused to engage in these negotiations.  Thus, there is no

evidence that GreenFuels acted in bad faith at any point, during

or after the April 2021 Meeting.

GreenFuels was entitled to enforce its rights under the

Subordination Agreement in June and to declare an Event of

Default.  The implied covenant cannot be used to create an

obligation where "a proposed implied term defeats a right that a

party actually bargained for."  Spinelli v. Nat'l Football

League, 903 F.3d 185, 206 (2d Cir. 2018).  Aik Chuan's effort to

imply a term to the parties' contract -- that is inconsistent

with GreenFuels' express rights under the contract to require

the Verification of Module 2 by May 31, 2021 -- fails.

Finally, Aik Chuan argued in its pretrial submissions that

GreenFuels breached the covenant of good faith and fair dealing

by interfering with Global Energy obtaining additional funding

from British Petroleum ("BP") in February 2021, from Silverpeak

in April 2021, and from Resilient Energi in May 2021.[7]  This

argument fails.  Most significantly, Aik Chuan has not shown

that an infusion of additional funding from any source in the

spring of 2021 would have allowed Global Energy to avoid an

Event of Default.  The problems with the functioning of Module 2

---

[7] Aik Chuan appears to have abandoned this argument at trial.  It
was not pursued during the examination of the plaintiff's
witnesses nor discussed in summation.

43

were severe and Aik Chuan has not shown that access to additional cash would have permitted the Verification Test to be successfully completed by May 31, 2021.  Aside from this fatal flaw, however, Aik Chuan has failed to show that GreenFuels engaged in any wrongdoing.

GreenFuels objected in March of 2021 that Global Energy had breached a duty of confidentiality by discussing an offtake agreement with BP.  The assertion of its own contractual rights is not evidence of wrongdoing by GreenFuels.  In April 2021, Silverpeak, a third-party investor, requested that GreenFuels pay Silverpeak's due diligence fees for a potential investment. GreenFuels' refusal to do so breached no obligation to Global Energy and was not wrongful.  Finally, in May 2021, Resilient Energi advised Global Energy and GreenFuels that it did not have cash available to invest but would be willing to search for funding in exchange for a fee.  GreenFuels had no obligation to pay those fees, and its refusal to do so violated no duty it owed to Global Energy.

In sum, Aik Chuan has failed to show that GreenFuels breached the covenant of good faith and fair dealing.  Although GreenFuels provided additional funding to Global Energy on three separate occasions in an effort to keep Global Energy afloat through the verification phase, it was not obliged to extend

even more funds or to find additional funding for Global Energy.
Aik Chuan has failed to show that any of GreenFuels' actions
"frustrated or prevented" Global Energy from achieving the
Verification of Module 2 by May 31, 2021.

     2.   Legality of the Foreclosure Sale

Aik Chuan's remaining affirmative defenses to GreenFuels'
breach of contract claim relate to the Foreclosure Sale.  At
bottom, Aik Chuan argues that GreenFuels failed to conduct the
Foreclosure Sale in a commercially reasonable manner and that
the foreclosure sale price of $1.7 million does not reflect the
fair market value of the property sold.

As described below, Aik Chuan's argument regarding fair
market value fails for several reasons.  But, first and
foremost, there would have been no foreclosure sale if Aik Chuan
had assumed Global Energy's obligations to pay GreenFuels, as
the Subordination Agreement required Aik Chuan to do.  If Aik
Chuan had not rejected its obligations under the Subordination
Agreement, GreenFuels could not have proceeded with the
Foreclosure Sale.  As Sai Tiong Leow admitted at trial, Aik
Chuan understood this at the time.  Thus, Aik Chuan's own breach
of the Subordination Agreement is the but-for cause of the
Foreclosure Sale.  Putting aside this impediment, Aik Chuan has
also failed to show that the Foreclosure Sale price of $1.7

million should not be used as the fair market value for the
property sold at the sale.

> i.    Governing Law

As a preliminary matter, the parties disagree over the law
which governs the Foreclosure Sale.  GreenFuels asserts that
Tennessee law applies to the Foreclosure Sale.  Aik Chuan agrees
that Tennessee real property law applies to the sale of the land
but argues that the UCC governs the sale of the personal
property on the land.

A court sitting in diversity must apply the choice of law
rules of the forum state.  Kinsey v. N.Y. Times Co. , 991 F.3d
171, 176 (2d Cir. 2021).  Under New York's choice of law rules,
courts "generally enforce choice-of-law clauses and [] contracts
should be interpreted so as to effectuate the parties' intent."
Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A., 51 F.4th
456, 472 (2d Cir. 2022) (citation omitted).

The foreclosure occurred pursuant to the Deed of Trust.
The Deed of Trust provides that, "[u]pon the occurrence and
during the continuance of an Event of Default Trustee shall have
the power to sell Deed of Trust Estate and property subject
hereto in accordance with the laws of the State of Tennessee,
having first given notice of such sale as then required by
applicable Law." (emphasis added).

Under Tennessee law, where a creditor seeks to recover a
balance "still owing on an indebtedness after a . . .
foreclosure sale of real property secured by a deed of trust . .
. , the creditor shall be entitled to a deficiency judgment in
an amount sufficient to satisfy fully the indebtedness."  Tenn.
Code Ann. § 35-5-117(a) (2021).  "[A]bsent a showing of fraud,
collusion, misconduct, or irregularity in the sale process, the
deficiency judgment shall be for the total amount of
indebtedness prior to the sale plus the costs of the foreclosure
and sale, less the fair market value of the property at the time
of the sale."  Id. at § 35-5-117(b) (emphasis added).

There is a "rebuttable prima facie presumption that the
sale price of the property is equal to the fair market value of
the property at the time of sale."  Id.  A party may overcome
that presumption by proving "by a preponderance of the evidence
that the property sold for an amount materially less than the
fair market value of property at the time of the foreclosure
sale."  Id. at § 35-5-117(c) (emphasis added).  Tennessee courts
recognize the statutory presumption of fair market value as a
"difficult burden for the debtor to overcome," although they
have "refrained from establishing a bright-line percentage,
above or below which the statutory presumption is
rebutted."  Branch Banking & Tr. Co. v. Hill, 582 S.W.3d 221,

47

234-35 (Tenn. Ct. App. 2019) (citation omitted).[8]  Instead, courts broadly consider "the condition of the property and any other factors that may provide information concerning the marketability of the property and the surrounding area."  Id. (citation omitted).

In addition, Tennessee law sets out requirements for any advertisement of a foreclosure sale.  Such advertisements shall:

> 1. Give the names of the plaintiff and defendant, or parties interested;
>
> 2. Give a concise description of the land; . . .
>
> 3. Mention the time and place of sale;
>
> 4. A. Identify each and every lien or claimed lien of the United States . . .
>
> 5. A. Identify each and every lien or claimed lien of the state . . .

Id. at § 35-5-104.

Under Article 9 of the UCC, "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable."  N.Y. U.C.C. Law § 9-610(b).[9]  Where a security agreement covers both

---

[8] Tenn. Code Ann. § 35-5-117 was formerly Tenn. Code Ann. § 35-5-118 and is referred to that way in Branch Banking, 582 S.W.3d 221.

[9] Aik Chuan admits that, were the UCC to apply, there are no material differences between New York's version of the UCC and Tennessee's version with respect to legal principles relevant to this case.

personal and real property, however, a secured party may
proceed:

> (1) under [the UCC] as to the personal property
> without prejudicing any rights with respect to the
> real property; or

> (2) as to both the personal property and the real
> property in accordance with the rights with respect to
> the real property, in which case the other provisions
> of this part do not apply.

Id. at § 9-604(a) (emphasis added).

Under New York law, "fair market value" for purpose of a
damages calculation for a breach of contract claim, is "the
price at which the property would change hands between a willing
buyer and a willing seller, neither being under any compulsion
to buy or to sell and both having reasonable knowledge of
relevant facts." Schonfeld v. Hilliard, 218 F.3d 164, 178 (2d
Cir. 2000) (citation omitted). "[A] recent sale price for the
subject asset, negotiated by parties at arm's length, is the
best evidence of [the asset's] market value." Id. "If no prior
sales history is available, experts may give their opinion of
the asset's value." Id.

> ii.  Application

Tennessee real property law applies to the sale of the
Rockwood Plant.  The Deed of Trust covers both the personal and
real property sold through foreclosure and the Foreclosure Sale
involved the entirety of the Rockwood Plant.  GreenFuels has

49

shown that the foreclosure sale complied with every aspect of
Tennessee real property law and, in any event, also met the
commercial reasonableness standard under the UCC that governs a
sale of collateral when it is sold separately from real estate.
See N.Y. U.C.C. Law §§ 9-610(b), 9-627(a)-(b).

GreenFuels gave timely notice of the Foreclosure Sale and
published it as required under Tennessee law.  The Foreclosure
Notice was published on three separate occasions in the local
newspaper.  Luddy engaged in discussions with various entities,
attempting to interest them in a purchase of the Rockwood Plant,
to no avail.  More importantly, however, GreenFuels provided
notice to the two companies with the greatest knowledge of the
Rockwood Plant's value: Aik Chuan and Proton Power.

As discussed above, at the time of the sale, the Rockwood
Plant was largely defunct -- Module 2 had yet to work as
intended, its construction and operation were plagued with
setbacks, Module 1 had been scrapped for parts, and the USP&E
workers had walked off the job.  Both Aik Chuan and Proton Power
had intimate knowledge of the state of the Rockwood Plant and
the very substantial problems with the pyrolysis process.  Both
attended the Foreclosure Sale and declined to bid.  GreenFuels
has shown that it is entitled to the presumption that the sale

50

price of the property of $1.7 million[10] is equal to the fair
market value of the property at the time of sale, and also that
that price was indeed the fair market value.  This finding is
reinforced by the fact that the attempts by Global Energy to
find a new financial partner for the plant failed, and the only
price at which there was a willing buyer was $1.7 million.

Aik Chuan makes several arguments in an effort to show that
the Foreclosure Sale was compromised by irregularities and that
the fair market value of the property sold through that sale was
approximately $107 million.  These arguments fail.

Aik Chuan first argues that the published notice was
deficient because it did not describe in detail the machinery or
fixtures at the Rockwood Plant.[11]  The Foreclosure Notice
included a "concise description of the land."  The Notice also
stated that the sale would include "any tangible personal
property or fixtures" at the Site.  This Notice complied with
Tennessee law.  Nothing more was required.

---

[10] GreenFuels set the price of $1.7 million after accounting for
liens and expenses of which it was aware at the time.  These
included a lien of $911,409.86 which USP&E placed on the
property and GreenFuels' estimated legal costs in pursuing Aik
Chuan in this litigation.

[11] Aik Chuan asserts that under UCC law, GreenFuels was required
to provide notice of the sale of the Collateral to USP&E.  As
discussed above, the applicable body of law for the sale is
Tennessee real property law.

SA51                    SA51                    SA51

Aik Chuan next complains that GreenFuels did not obtain an appraisal of the property before the sale. There is no such requirement under the law.

Aik Chuan argues that GreenFuels' attempts to market the Rockwood Plant were deficient because it did not attempt to locate a buyer within the fuel industry. This argument can be swiftly rejected. GreenFuels had no obligation to market the Rockwood Plant to anyone but did so anyway. Those efforts failed. The Verification Test was critical to all major financers, and the Rockwood Plant had failed to achieve this critical proof of concept.

As for the sale price, Aik Chuan points out that it sold the Rockwood Plant to Global Energy just one year earlier for $85 million. But, except for the $250,000 paid at closing, Global Energy paid no cash for the Rockwood Plant. Instead, the remainder of the purchase price was reflected in the equity warrant and the Promissory Notes. Thus, the face value of the Promissory Notes does not provide a basis to find that the fair market value in 2021 for a plant which had failed to pass the Verification Test can be set at $85 million in cash.

Finally, Aik Chuan argues that it has rebutted any presumption that $1.7 million was the fair market value for the Rockwood Plant. It has offered one alternative calculation of

52

value.  It contends that the fair market value was $107 million
because the Rockwood Plant was a "going concern" at the date of
the sale.  Aik Chuan relies for this calculation on the
testimony of its expert, who used Kolmar's projections of the
Plant's profitability, to which he applied a conservative
discounted cash flow analysis.  This approach is fundamentally
flawed.

First, the Plant was not a going concern at the time of
the sale.  It was a plant built for a novel, unproven technology
that had disappointed its owners and operators time and again.
After seven years and tens of millions of dollars it consisted
of only one module and that module could not be operated without
risk to life, could not run continuously, and could not produce
renewable diesel in commercial quantities.  This was not a going
concern.  As defined by Aik Chuan's expert, value as a going
concern "is the value in continued use, as a mass assemblage of
income-producing assets, and as a going concern business
enterprise."  The Second Circuit has likewise defined going
concern as "the value of a commercial enterprise's assets as an
active business with future earning power."  In re TransCare
Corp., 81 F.4th 37, 52 (2d Cir. 2023) (citation omitted).  Since
the Rockwood Plant was not an active business at the time of the
Foreclosure Sale, it cannot be valued under the methodology that

applies to a going concern. What existed, in essence, was an idea that needed significant additional cash infusions to see whether the idea could be realized.[12]

There is a second disqualifying flaw in the methodology employed by Aik Chuan's expert. The Kolmar financial models upon which Brown's valuation is premised reflect a fully commercialized plant with an operating capacity of either six or eighteen modules. The projections assume that Module 2 had passed the Verification Test and that many more identical modules had been constructed and were functioning at a commercial level. Accordingly, Brown's analysis does not establish the fair market value of the Rockwood Plant as of the time of the Foreclosure Sale.

## II. Aik Chuan's Counterclaims

Aik Chuan's counterclaims largely track its affirmative defenses to GreenFuels' breach of contract claim. Aik Chuan asserts counterclaims against GreenFuels for breaches of the Subordination Agreement premised on its assertion of invalid Events of Default, conducting an illegal Foreclosure Sale, and violating the covenant of good faith and fair dealing. For the

---

[12] It bears noting that after the Foreclosure Sale, Kolmar came to doubt that any renewable diesel could be produced through Module 2 and dismantled it. As of the date of this trial, the renewable diesel pyrolysis technology has never been commercialized anywhere.

reasons already discussed, Aik Chuan's counterclaims are either duplicative of its failed affirmative defenses or not supported by the record.  They are rejected.

Aik Chuan's tortious interference claim, which is brought against both GreenFuels and Kolmar, is based on the contention that GreenFuels improperly interfered with the Promissory Notes that Global Energy had issued to Aik Chuan.  Aik Chuan contends that both GreenFuels and Kolmar interfered with those Notes by wrongfully declaring an Event of Default.[13]  It seeks damages in the amount of $117 million, which it calculates as the amount owed by Global Energy under the Promissory Notes.  This claim also fails.

A cause of action for tortious interference under New York law[14] requires: "(1) the existence of a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of that contract, (3) the defendant's intentional procurement of a third-party's breach of contract without justification, and (4) damages." Kaplan v. Reed Smith LLP, 919 F.3d 154, 160 (2d Cir. 2019) (citation omitted).  A plaintiff must show "that the

---

[13] Aik Chuan narrowed this claim significantly by the end of the trial, withdrawing the other theories of tortious interference it had once asserted.

[14] The parties have consented to the application of New York law to the tortious interference claim.

contract would not have been breached 'but for' the defendant's conduct." Rich v. Fox News Network, LLC, 939 F.3d 112, 127 (2d Cir. 2019) (citation omitted).  In response to such a claim, "a defendant may raise the economic interest defense -- that it acted to protect its own legal or financial stake in the breaching party's business." White Plains Coat & Apron Co. v. Cintas Corp., 8 N.Y.3d 422, 426 (2007).  Without a showing of "malice or illegality," the economic interest defense acts as a complete bar to a tortious interference claim.  White Plains Coat & Apron Co. v. Cintas Corp., 460 F.3d 281, 283 (2d Cir. 2016).

Aik Chuan has failed to show that Kolmar and GreenFuels procured the Event of Default discussed in this Opinion -- the failure to pass a Verification Test by May 31, 2021 -- or to prove that it was damaged by GreenFuels declaring that default. First, as already explained, Kolmar's participation in the April 2021 Meeting did not "procure" Module 2's failure or the Event of Default.  Although Aik Chuan tried to suggest at trial that the plan for parallel piping discussed at the April 2021 Meeting interfered with Module 2 meeting the May 31, 2021 Verification Date, that argument is specious.  Module 2 was never able to operate continuously, safely, or commercially, and could not have passed the Verification Test by May 31, 2021.  Far from

56

procuring a breach, GreenFuels tried to assist Global Energy.
It extended millions of dollars more to Global Energy in 2020
and 2021 than originally contemplated.

Moreover, in pursuing its tortious interference claim, Aik
Chuan points to nothing more than GreenFuels' lawful exercise of
its contractual rights.  GreenFuels made an assessment that a
further extension of its loan commitment to Global Energy was
not prudent.  It was entitled to declare a default.

The cases on which Aik Chuan relies do not suggest that any
other conclusion is warranted.  New York courts have expressly
recognized that the economic interest defense may be applied
"where defendant was the breaching party's creditor."  White
Plains Coat & Apron, 8 N.Y.3d at 426.

As for its claim for damages, Aik Chuan failed at trial to
prove that the Rockwood Plant would ever have achieved
commercial success or that Global Energy would ever had paid off
the Promissory Notes.  There is no evidence that the renewable
diesel pyrolysis technology has reached commercialization
anywhere as of today.  And, as representatives for Aik Chuan
admitted at trial, if Aik Chuan had assumed the Financing
Documents, as Section 8.2 of the Subordination Agreement
required, there would never have been a foreclosure sale and
Global Energy would have continued to own the Rockwood Plant.

57

III. Damages

Having determined that Aik Chuan breached the Subordination
Agreement, and that GreenFuels and Kolmar are not liable on its
counterclaims, the sole remaining question concerns the amount
of damages that Aik Chuan owes to GreenFuels.  GreenFuels
calculates, correctly, that it is owed $28,494,451 as of
November 16, 2023.

In making this calculation, GreenFuels relies on the
provisions of its Loan Agreement with Global Energy, and Aik
Chuan's commitment in the Subordination Agreement to "assume"
the Financing Documents.  Under the Loan Agreement, in the Event
of Default, Global Energy owes the principal of the loans, the
70% loan fee, accrued annual interest of 12%, and a post-default
interest rate of 25% per annum.  If Aik Chuan had assumed the
Financing Documents in June of 2021, it would have owed just
over $19 million.  Today, the sum is roughly $28.5 million.

Aik Chuan asserts that the Subordination Agreement does not
provide for interest of either 12% or 25% on the Outstanding
Indebtedness and thus it owes no more than $19 million and pre-
judgment interest.[15]  This argument fails.

The Subordination Agreement is clear.  It states that
following an Event of Default and "[i]mmediately upon Lender's

---

[15] Aik Chuan does not contest the plaintiff's damages calculation
if the Outstanding Indebtedness does bear interest.

issuance of the Remedies Notice, [Aik Chuan] will assume, and agrees it is obligated to assume, the Financing Documents from the Lender." GreenFuels agreed to assign the Financing Documents to Aik Chuan at the time of assumption "in exchange for cash consideration in the amount of the Outstanding Indebtedness." (emphasis added). "Financing Documents" in the Subordination Agreement incorporates the definition from the Loan Agreement, which in turn includes the Loan Agreement, the Collateral Documents, and the Subordination Agreement. Thus, Aik Chuan is obligated to pay Global Energy's debt to GreenFuels. As of November 16, 2023, that number is $28,494,451.

### Conclusion

Aik Chuan breached the Subordination Agreement and is liable to GreenFuels for the Outstanding Indebtedness in the amount of $28,494,451 as of November 16, 2023. Judgment is entered for GreenFuels and Kolmar on the defendant's counterclaims.

Dated:    New York, New York
          November 20, 2023

                                        DENISE COTE
                              United States District Judge

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
AMERICAN GREENFUELS ROCKWOOD           :
(TENNESSEE), LLC,                      :
                                       :
                    Plaintiff,         :
                                       :
          -v-                          :
                                       :
AIK CHUAN CONSTRUCTION PTE. LTD.,      :
                                       :
                    Defendant.         :
                                       :       21cv7680 (DLC)
  ------------------------------------ :
                                       :          ORDER
AIK CHUAN CONSTRUCTION PTE. LTD.,      :
                                       :
          Counterclaim Plaintiff,      :
                                       :
          -v-                          :
                                       :
KOLMAR AMERICAS, INC. and AMERICAN     :
GREENFUELS ROCKWOOD (TENNESSEE), LLC,  :
                                       :
          Counterclaim Defendants.     :
                                       :
-------------------------------------- X
```

DENISE COTE, District Judge:

An Opinion of November 20, 2023 held that the plaintiff is
entitled to judgment on its breach of contract claim and the
counterclaim defendants are entitled to judgment on Aik Chuan's
counterclaims.  It is hereby

ORDERED that by **November 27, 2023,** the plaintiff shall
provide the defendant with its proposed judgment.  The parties
shall promptly confer and attempt to resolve any disputes.  A

proposed judgment and any objections to it shall be filed by

**November 30, 2023.**

Dated:     New York, New York
           November 20, 2023

_____
DENISE COTE
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
                                     :
AMERICAN GREENFUELS ROCKWOOD         :
(TENNESSEE), LLC,                    :
                                     :
                  Plaintiff,         :
                                     :
           -v-                       :
                                     :
AIK CHUAN CONSTRUCTION PTE. LTD.,    :
                                     :
                  Defendant.         :
                                     :        21cv7680 (DLC)
         ------------------------------:
                                     :            ORDER
AIK CHUAN CONSTRUCTION PTE. LTD.,    :
                                     :
         Counterclaim Plaintiff,     :
                                     :
           -v-                       :
                                     :
KOLMAR AMERICAS, INC. and AMERICAN   :
GREENFUELS ROCKWOOD (TENNESSEE), LLC, :
                                     :
         Counterclaim Defendants.    :
                                     :
------------------------------------ X

DENISE COTE, District Judge:

An Opinion of November 20, 2023 held that the plaintiff is
entitled to judgment on its breach of contract claim and the
counterclaim defendants are entitled to judgment on Aik Chuan's
counterclaims.  An Order of November 20 required the parties to
confer and submit a proposed monetary judgment.  On November 30,
GreenFuels filed its proposed judgment.  Also on November 30,
Aik Chuan filed a letter opposition to the proposed judgment
raising a new legal objection.  It is hereby

ORDERED that by noon on **December 5, 2023,** the plaintiff
shall provide a proposed final judgment that includes the
judgment amount calculated as of December 5, 2023.

IT IS FURTHER ORDERED that the plaintiff shall also file a
detailed mathematical description of its damages calculation.

Dated:     New York, New York
           December 4, 2023


                              _____
                                    DENISE COTE
                         United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                        :
AMERICAN GREENFUELS ROCKWOOD            :
(TENNESSEE), LLC,                       :
                                        :
                     Plaintiff,         :
                                        :
            -v-                         :
                                        :
AIK CHUAN CONSTRUCTION PTE. LTD.,       :
                                        :
                     Defendant.         :
                                        :          21cv7680 (DLC)
       --------------------------------:
                                        :          MEMORANDUM OPINION
AIK CHUAN CONSTRUCTION PTE. LTD.,       :             AND ORDER
                                        :
            Counterclaim Plaintiff,     :
                                        :
            -v-                         :
                                        :
KOLMAR AMERICAS, INC. and AMERICAN      :
GREENFUELS ROCKWOOD (TENNESSEE), LLC,   :
                                        :
            Counterclaim Defendants.    :
                                        :
-------------------------------------- X

APPEARANCES:

For Plaintiff and Counterclaim Defendants:
John N. Thomas
Jenna Christine Hutchinson
Troutman Pepper Hamilton Sanders LLP
875 Third Avenue
New York, NY 10022

Leslie A. Davis
Jenna Noelle Tyrpak
Margaret Burnside
Troutman Pepper Hamilton Sanders LLP
401 9th Street, NW, Suite 1000
Washington, DC 20004

Sheila Zifu Chen

Troutman Pepper Hamilton Sanders LLP
5 Park Plaza, Suite 1400
Irvine, CA 92614

For Defendant and Counterclaim Plaintiff:
John F. Hagan, Jr.
Mark J. Samartino
Cameron Davis
Arnold & Porter Kay Scholer LLP
70 West Madison Street, Suite 4200
Chicago, IL 60602

Melissa A. Brown
Arnold & Porter Kay Scholer LLP
250 West 55th Street
New York, NY 10019

DENISE COTE, District Judge:

A bench trial was held in this action between November 13 and November 16, 2023.  On November 20, the Court granted judgment to the plaintiff American GreenFuels Rockwood (Tennessee), LLC ("GreenFuels") on its breach of contract claim and to the counterclaim defendants on all counterclaims brought by Aik Chuan Construction Pte. Ltd. ("Aik Chuan").  See American Greenfuels Rockwood (Tennessee), LLC, v. Aik Chuan Construction Pte. Ltd., 21cv7680 (DLC), 2023 WL 8018271 (S.D.N.Y. Nov. 20, 2023).  Familiarity with this Opinion is assumed; all capitalized terms have the meanings previously assigned to them.

On November 30, GreenFuels filed its proposed judgment.  On that date, Aik Chuan raised a new challenge to GreenFuels' damages calculation.  Aik Chuan asserts for the first time that

GreenFuels improperly includes interest on the 70% kicker fee as part of its calculation.[1]

Aik Chuan's objection is without merit and has in any event been waived.  Trial courts may exercise discretion over "whether an argument has been waived."  <u>Brown v. City of New York</u>, 862 F.3d 182, 187 (2d Cir. 2017).  Where a party fails to raise an argument at trial, it may properly be deemed waived.  <u>Id.</u> at 188.

The calculation of damages is derived from the formula provided in the Loan Agreement.  Through the Subordination Agreement, Aik Chuan became responsible for paying that amount. The Loan Agreement included the requirement that the borrower pay a 70% kicker fee, and that the Loan Agreement's interest calculations would be applied to an amount that included that fee.

The plaintiff's executive Kevin Luddy, in the affidavit constituting his direct testimony, gave the plaintiff's then-current calculation of its damages.  Before Aik Chuan began its cross-examination of Luddy, the Court acknowledged that Aik Chuan could cross examine Luddy about the plaintiff's calculation of damages.  In its brief cross examination on this

---

[1] The parties do not dispute that the interest is properly applied to the principal amount of the loan.

3

issue, Aik Chuan did not question the application of interest to the 70% kicker fee.

Following the close of testimony on November 15, 2023, the Court asked counsel whether there were any objections to the plaintiff's calculation of damages.  Aik Chuan raised two objections: first, a legal challenge as to whether the Subordination Agreement requires Aik Chuan to pay the interest described in the Loan Agreement, and second, a challenge regarding the accuracy of one of the mathematical calculations. Aik Chuan did not otherwise dispute GreenFuels' damages calculation.  It did not question the inclusion of interest on the kicker fee.  The Court directed the parties to confer on the mathematical issue, and, on November 16, GreenFuels reported that the mathematical issue had been resolved.  The parties' agreement on the mathematics of the calculation required an understanding about both the sums to which the interest rates were applied and the interest rates themselves.

The parties supported their summation arguments with power-point presentations.  GreenFuels included a slide setting out the formula for its damage calculation.  That slide included interest on the 70% kicker fee.  GreenFuels' counsel made explicit reference to the kicker fee in his oral remarks.  Aik Chuan made no objection about the kicker fee in its own

4

summation.  It only argued that it was not required to pay either the 12% pre-default or the 25% post-default interest set out in the Loan Agreement.  The Court rejected this argument in its November 20 Opinion.  American Greenfuels Rockwood (Tennessee), 2023 WL 8018271, at *21.

The amount of damages to which GreenFuels has shown it is entitled is set forth in the Loan Agreement.  This includes the 70% kicker fee and interest on that fee.  In any event, Aik Chuan failed to raise an objection to this component of the damage calculation at trial, and accordingly that objection has been waived.

### Conclusion

Aik Chuan's November 30 objection to a damages calculation that includes the obligation to pay interest on the Loan Agreement's kicker fee is overruled.

Dated:     New York, New York
           December 4, 2023

                                    _____
                                     DENISE COTE
                            United States District Judge

5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

AMERICAN GREENFUELS ROCKWOOD
(TENNESSEE), LLC, a Delaware limited liability
company,
                                                                    Civil Action No.: 1:21-cv-07680
Plaintiff,

        -against-

AIK CHUAN CONSTRUCTION PTE. LTD., a
Singapore registered company,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

AIK CHUAN CONSTRUCTION PTE. LTD.,

Counterclaim Plaintiff,

        -against-

AMERICAN GREENFUELS ROCKWOOD
(TENNESSEE), LLC and KOLMAR AMERICAS,
INC.

Counterclaim Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

<h2 style="text-align:center">[PROPOSED] FINAL JUDGMENT</h2>

In accordance with the Court's Opinion and Order entered on November 20, 2023, the

following Final Judgment is hereby entered.

**IT IS ORDERED, ADJUDGED, AND DECREED** that for the reasons set forth in the

Court's Opinion and Order dated November 20, 2023, final judgment is entered in favor of

American GreenFuels Rockwood (Tennessee), LLC (AGFR) on AGFR's Breach of Contract

1

claim against Aik Chuan Construction Pte. Ltd. ("Aik Chuan"). The amount of the final

judgment owed by Aik Chuan to AGFR is calculated as follows:

1. $28,729,840 as of December 5, 2023; plus

2. Post-default interest at the rate of 25% per annum applied to the amount of
   $28,729,840 from December 6, 2023 until date of entry of this Judgment; plus

3. Post-judgment interest pursuant to 28 U.S.C. § 1961 from the date of entry of this
   Judgment.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that for the reasons set

forth in the Court's Opinion and Order dated November 20, 2023, final judgment is entered in

favor of AGFR and Kolmar Americas, Inc. on Aik Chuan's counterclaims.

The Court directs immediate entry of this Final Judgment by the Clerk of the Court.

**IT IS SO ORDERED.**

BY THE COURT:

_____
Hon. Denise Cote
United States District Court Judge

Dated: November 5, 2023
New York, New York

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
AMERICAN GREENFUELS ROCKWOOD           :
(TENNESSEE), LLC,                      :
                                       :
                    Plaintiff,         :
                                       :
            -v-                        :
                                       :
AIK CHUAN CONSTRUCTION PTE. LTD.,      :
                                       :
                    Defendant.         :
                                       :      21cv7680 (DLC)
 -------------------------------------:
                                       :      OPINION AND ORDER
AIK CHUAN CONSTRUCTION PTE. LTD.,      :
                                       :
            Counterclaim Plaintiff,    :
                                       :
            -v-                        :
                                       :
KOLMAR AMERICAS, INC. and AMERICAN     :
GREENFUELS ROCKWOOD (TENNESSEE), LLC,  :
                                       :
            Counterclaim Defendants.   :
-------------------------------------- X

APPEARANCES:

For plaintiff and counterclaim defendants:
John N. Thomas
Troutman Pepper Hamilton Sanders LLP
875 Third Avenue
New York, NY 10022

Leslie A. Davis
Margaret Burnside
Jenna N. Tyrpak
Troutman Pepper Hamilton Sanders LLP
401 9th Street, NW
Washington, DC 20004


For defendant and counterclaim plaintiff:
John F. Hagan, Jr.

Mark J. Samartino
Cameron J. Davis
Arnold & Porter Kaye Scholer LLP
70 West Madison Street, Suite 4200
Chicago, IL 60602

Melissa A. Brown
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019


DENISE COTE, District Judge:

Final judgment in this action was entered in favor of the plaintiff American GreenFuels Rockwood (Tennessee) ("GreenFuels") and the counterclaim defendant Kolmar Americas, Inc. ("Kolmar") on December 5, 2023. Defendant and counterclaim plaintiff Aik Chuan Construction Pte. Ltd. ("Aik Chuan") has moved to alter or amend the judgment pursuant to Fed. R. Civ. P. 59(e). For the following reasons, the motion to alter or amend the judgment is denied.

## Background

This litigation arises out of a failed project to develop a renewable diesel energy plant in Rockwood, Tennessee. Aik Chuan sold the partially-constructed plant in March of 2020 to non-party Global Energy. GreenFuels supplied a bridge loan to Global Energy for the purpose of Global Energy completing a validation phase of the manufacturing process, with the goal that Global Energy would be able to find an investor and pay Aik

2

Chuan.  Global Energy had issued promissory notes to Aik Chuan
and Aik Chuan had agreed to subordinate some of the Global
Energy debt to the GreenFuels bridge loan and, most
significantly for this litigation, to assume Global Energy's
obligations to GreenFuels in the event of a default (the
"Subordination Agreement").  Global Energy defaulted in May
2022.  Aik Chuan declined to assume the bridge loan obligations,
and GreenFuels foreclosed on the Rockwood plant.  GreenFuels
brought this action for breach of the Subordination Agreement.
Familiarity with prior Opinions in this case is presumed.  See
Am. GreenFuels Rockwood (Tennessee), LLC v. Aik Chuan Constr.
Pte. Ltd., 21cv7680 (DLC), 2023 WL 8018271 (S.D.N.Y. Nov. 20,
2023) (the "Trial Opinion"); Am. GreenFuels Rockwood
(Tennessee), LLC v. Aik Chuan Constr. Pte. Ltd., 21cv7680 (DLC),
2023 WL 8372476 (S.D.N.Y. Dec. 4, 2023) (the "Damages Opinion").

    GreenFuels filed this action on September 14, 2021,
bringing a breach of contract clam against Aik Chuan.  Aik Chuan
brought counterclaims against GreenFuels and its parent company,
Kolmar, alleging that the counterclaim defendants deliberately
induced a default and conducted a commercially unreasonable
foreclosure sale.

    The case was reassigned to this Court on August 17, 2022.
On September 30, GreenFuels and Kolmar's motions to dismiss were

3

largely denied.  Am. GreenFuels Rockwood (Tennessee), LLC v. Aik
Chuan Constr. Pte. Ltd., 21cv7680 (DLC), 2022 WL 4629255
(S.D.N.Y. Sept. 30, 2022).  Discovery was contentious.  A bench
trial was held between November 13 and November 16, 2023.  In an
Opinion of November 20, Aik Chuan was found to have breached the
Subordination Agreement and to be liable to GreenFuels in the
amount of $28,494,451 as of November 16, 2023.  Trial Opinion,
at *13, 21.  Judgment for GreenFuels and Kolmar was ordered on
Aik Chuan's counterclaims.  Id., at *21-22.

On November 30, the plaintiff and counterclaim defendants
submitted a proposed final judgment in the amount of
$28,494,451.  The same day, Aik Chuan objected to the amount of
damages, presenting an argument not made during the trial.  On
December 4, Aik Chuan's objection was denied.  Final judgment
was entered on December 5, 2023.  GreenFuels attempted to
collect on the judgment through a demand letter on December 27.

Aik Chuan filed this motion to alter or amend the judgment
pursuant to Fed. R. Civ. P. 59(e) on January 2, 2024.  On the
same day, Aik Chuan filed a motion to extend the automatic stay
of judgment, which was to expire on January 4.  That motion to
extend was denied on January 3.

The motion to alter or amend the judgment became fully
submitted on January 31.  In their opposition to the motion,

4

GreenFuels and Kolmar cross moved for sanctions to be imposed on
Aik Chuan.  The motion for sanctions became fully submitted on
February 7.

### Discussion

"A court may grant a Rule 59(e) motion only when the movant
identifies an intervening change of controlling law, the
availability of new evidence, or the need to correct a clear
error or prevent manifest injustice."  Metzler Investment Gmbh
v. Chipotle Mexican Grill, Inc., 970 F.3d 133, 142 (2d Cir.
2020) (citation omitted).  A motion to alter or amend "may not
be used to relitigate old matters, or to raise arguments or
present evidence that could have been raised prior to the entry
of judgment."  4 Pillar Dynasty LLC v. New York & Company, Inc.,
933 F.3d 202, 217 (2d Cir. 2019) (citing Exxon Shipping Co. v.
Baker, 554 U.S. 471, 485 n.5 (2008)).

Aik Chuan makes essentially three arguments as to why the
judgment should be amended.  None of these arguments meet the
Rule 59(e) standard.  Aik Chuan has not cited any change in
controlling law or new evidence.  It does not suggest that any
manifest injustice has occurred.  Instead, it asserts that there
has been clear legal error.  Under that guise, it regurgitates
arguments that have already been considered and rejected.

5

I.  Interest Calculations

Aik Chuan begins by renewing several arguments regarding interest rate calculations.  Aik Chuan first argues that the Trial Opinion incorrectly applied the interest rate provisions in the Loan Agreement between GreenFuels and Global Energy to calculate prejudgment interest obligation assumed by Aik Chuan. As it did at the trial, Aik Chuan argues that the Subordination Agreement does not contain a provision for interest on the outstanding indebtedness.  The Trial Opinion considered and rejected that argument.  Trial Opinion, at *21.

Aik Chuan next argues that it was improper to apply the Loan Agreement's interest provisions to the kicker fee.  Aik Chuan first raised this argument in a post-judgment letter objection.  Damages Opinion, at *1.  The objection was denied as meritless and as waived.  Id.

Additionally, Aik Chuan contends that the damages for its breach of the Subordination Agreement should have been capped at $19,014,303, which was the Outstanding Indebtedness listed in a June 4, 2021 Notice of Default demand letter.  As explained in the Trial Opinion, however, Aik Chuan did not assume the Global Energy obligations and pay GreenFuels, as it was contractually obligated to do.  As a result, interest accrued and the debt became $28,494,451.  Id., at *21.

6

II.  Going Concern

Aik Chuan next argues that the Trial Opinion made a clear legal error by incorrectly concluding that the Rockwood Plant was not a going concern at the time of the Foreclosure Sale. This argument was considered and rejected at trial.  Trial Opinion, at *19-20.

III. Foreclosure Sale

Finally, Aik Chuan argues that it was clear legal error to apply Tennessee law to the Foreclosure Sale, rather than the UCC, under which Aik Chuan contends the Foreclosure Sale should have been deemed commercially unreasonable.  The Trial Opinion considered and rejected these arguments.  Trial Opinion, at *18.

IV.  Sanctions

GreenFuels and Kolmar have moved for sanctions against Aik Chuan for abuse of the judicial process.  They request that the Court exercise its inherent power to impose sanctions on Aik Chuan and its attorneys by granting GreenFuels and Kolmar the fees incurred in opposing this motion.

"Every district court has the inherent power to supervise and control its own proceedings."  Mitchell v. Lyons Pro. Servs., Inc., 708 F.3d 463, 467 (2d Cir. 2013) (citation omitted).  That inherent power includes the power to "sanction a party or an attorney who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  Rossbach v. Montefiore

7

<u>Medical Center</u>, 81 F.4th 124, 141 (2d Cir. 2023) (citation
omitted).  Representational misconduct that is "integrally
related to [the attorney's] role as an advocate" for their
client "independently necessitates an explicit finding of bad
faith."  <u>Id.</u> at 143 (citation omitted).  "A district court may
not impose attorney's fees as a sanction without first making an
explicit finding that the sanctioned party . . . acted in bad
faith in engaging in the sanctionable conduct."  <u>Id.</u> at 142.

GreenFuels is right in observing that Aik Chuan's 59(e)
motion is meritless.  Despite Aik Chuan's purported
acknowledgment that the standard for such motions is strict and
that Rule 59 should not be a vehicle for rehashing arguments
already rejected after full consideration, Aik Chuan ignored
those strictures and brought a motion that is nothing more than
a regurgitation of previously briefed and rejected arguments.
It would also appear, as GreenFuels argues, that Aik Chuan has
used this device (and other procedural devices) to delay the
date by which it must file an appeal and ultimately to delay the
enforcement of the judgment.

GreenFuels argues as well that Aik Chuan has used improper
litigation tactics throughout this litigation, and thus, that
this motion is part of a pattern.  Among other things,
GreenFuels points to Aik Chuan's delays in producing documents,

its efforts to obtain GreenFuels' proprietary and confidential
business information, its abuse of this Court's procedures from
presenting arguments when filing a Pretrial Order, and its
pursuit during trial of several specious arguments that lacked
any evidentiary support.

Aik Chuan's conduct throughout this litigation has
certainly been aggressive.  It has repeatedly made choices that
imposed unnecessary burdens on the Court and unreasonably drove
up the costs of litigation for GreenFuels and Kolmar.  Whether
this conduct warrants sanctions through the exercise of a
court's inherent power is, however, a separate issue.  While Aik
Chuan's litigation tactics should not be encouraged or condoned,
the Court is unable to conclude that this meritless Rule 59(e)
motion was filed in bad faith.

## Conclusion

Aik Chuan's January 2, 2024 motion to alter or amend the
judgment is denied.  The plaintiff and counterclaim defendants'
January 17 motion for sanctions is denied.  The Clerk of Court
shall close the case.

Dated:     New York, New York
           March 20, 2024

                                   _____
                                   DENISE COTE
                                   United States District Judge

9

# STATUTORY ADDENDUM

## N.Y. C.P.L.R. § 5001. Interest to Verdict, Report or Decision

**(a) Actions in which recoverable**. Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.

* * * * *

## N.Y. C.P.L.R. § 5004. Rate of Interest

(a) Interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute; provided the annual rate of interest to be paid in an action arising out of a consumer debt where a natural person is a defendant shall be two percentum per annum (i) on a judgment or accrued claim for judgments entered on or after the effective date of the chapter of the laws of two thousand twenty-one which amended this section, and (ii) for interest upon a judgment pursuant to section five thousand three of this article from the date of the entry of judgment on any part of a judgment entered before the effective date of the chapter of the laws of two thousand twenty-one which amended this section that is unpaid as of such effective date.

\* \* \* \* \*

## N.Y. U.C.C. § 9-604. Procedure if Security Agreement Covers Real Property, Fixtures, or Cooperative Interests

(a) Enforcement: personal and real property. If a security agreement covers both personal and real property, a secured party may proceed:

> (1) under this part as to the personal property without prejudicing any rights with respect to the real property; or

> (2) as to both the personal property and the real property in accordance with the rights with respect to the real property, in which case the other provisions of this part do not apply.

(b) Enforcement: fixtures. Subject to subsection (c), if a security agreement covers goods that are or become fixtures, a secured party may proceed:

> (1) under this part; or

> (2) in accordance with the rights with respect to real property, in which case the other provisions of this part do not apply.

* * * * *

### N.Y. U.C.C. § 9-610. Disposition of Collateral After Default

. . .

(b) Commercially reasonable disposition. Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms.

* * * * *

### N.Y. U.C.C. § 9-615. Application of Proceeds of Disposition; Liability for Deficiency and Right to Surplus

. . .

(d) Surplus or deficiency if obligation secured. If the security interest under which a disposition is made secures payment or performance of an obligation, after making the payments and applications required by subsection (a) and permitted by subsection (c):

    (1) unless subsection (a)(4) requires the secured party to apply or pay over cash proceeds to a consignor, the secured party shall account to and pay a debtor for any surplus; and

    (2) the obligor is liable for any deficiency.

(e) No surplus or deficiency in sales of certain rights to payment. If the underlying transaction is a sale of accounts, chattel paper, payment intangibles, or promissory notes:

    (1) the debtor is not entitled to any surplus; and

    (2) the obligor is not liable for any deficiency.

(f) Calculation of surplus or deficiency in disposition to person related to secured party. The surplus or deficiency following a disposition is calculated based on the amount of proceeds that would have been realized in a disposition complying with this part to a transferee other than the secured party, a person related to the secured party, or a secondary obligor if:

    (1) the transferee in the disposition is the secured party, a person related to the secured party, or a secondary obligor; and

    (2) the amount of proceeds of the disposition is significantly below the range of proceeds that a complying disposition to a person other than the secured party, a person related to the secured party, or a secondary obligor would have brought.

. . .

# OFFICIAL COMMENT

. . .

**6. Certain "Low-Price" Dispositions.** Subsection (f) provides a special method for calculating a deficiency or surplus when the secured party, a person related to the secured party (defined in Section 9-102), or a secondary obligor acquires the collateral at a foreclosure disposition. It recognizes that when the foreclosing secured party or a related party is the transferee of the collateral, the secured party sometimes lacks the incentive to maximize the proceeds of disposition. As a consequence, the disposition may comply with the procedural requirements of this Article (e.g., it is conducted in a commercially reasonable manner following reasonable notice) but nevertheless fetch a low price.

Subsection (f) adjusts for this lack of incentive. If the proceeds of a disposition of collateral to a secured party, a person related to the secured party, or a secondary obligor are "significantly below the range of proceeds that a complying disposition to a person other than the secured party, a person related to the secured party, or a secondary obligor would have brought," then instead of calculating a deficiency (or surplus) based on the actual net proceeds, the calculation is based upon the amount that would have been received in a commercially reasonable disposition to a person other than the secured party, a person related to the secured party, or a secondary obligor. Subsection (f) thus rejects the view that the secured party's receipt of such a price necessarily constitutes noncompliance with Part 6. However, such a price may suggest the need for greater judicial scrutiny. See Section 9-610, Comment 10.

* * * * *

### N.Y. U.C.C. § 9-626. Action in Which Deficiency or Surplus is in Issue

(a) Applicable rules if amount of deficiency or surplus is in issue. In an action arising from a transaction, other than a consumer transaction, in which the amount of a deficiency or surplus is in issue, the following rules apply:

(1) A secured party need not prove compliance with the provisions of this part relating to collection, enforcement, disposition, or acceptance unless the debtor or a secondary obligor places the secured party's compliance in issue.

(2) If the secured party's compliance is placed in issue, the secured party has the burden of establishing that the collection, enforcement, disposition, or acceptance was conducted in accordance with this part.

(3) Except as otherwise provided in Section 9-628, if a secured party fails to prove that the collection, enforcement, disposition, or acceptance was conducted in accordance with the provisions of this part relating to collection, enforcement, disposition, or acceptance, the liability of a debtor or a secondary obligor for a deficiency is limited to an amount by which the sum of the secured obligation, expenses, and attorney's fees exceeds the greater of:

(A) the proceeds of the collection, enforcement, disposition, or acceptance; or

(B) the amount of proceeds that would have been realized had the noncomplying secured party proceeded in accordance with the provisions of this part relating to collection, enforcement, disposition, or acceptance.

(4) For purposes of paragraph (3)(B), the amount of proceeds that would have been realized is equal to the sum of the secured obligation, expenses, and attorney's fees unless the secured party proves that the amount is less than that sum.

* * * * *

### N.Y. U.C.C. § 9-627. Determination of Whether Conduct was Commercially Reasonable

. . .

(b) Dispositions that are commercially reasonable. A disposition of collateral is made in a commercially reasonable manner if the disposition is made:

> (1) in the usual manner on any recognized market;
>
> (2) at the price current in any recognized market at the time of the disposition; or
>
> (3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.

* * * * *

## Tenn. Code. Ann. § 35-5-117. Deficiency Judgment

(a) In an action brought by a creditor to recover a balance still owing on an indebtedness after a trustee's or foreclosure sale of real property secured by a deed of trust or mortgage, the creditor shall be entitled to a deficiency judgment in an amount sufficient to satisfy fully the indebtedness.

(b) In all such actions, absent a showing of fraud, collusion, misconduct, or irregularity in the sale process, the deficiency judgment shall be for the total amount of indebtedness prior to the sale plus the costs of the foreclosure and sale, less the fair market value of the property at the time of the sale. The creditor shall be entitled to a rebuttable prima facie presumption that the sale price of the property is equal to the fair market value of the property at the time of the sale.

(c) To overcome the presumption set forth in subsection (b), the debtor must prove by a preponderance of the evidence that the property sold for an amount materially less than the fair market value of property at the time of the foreclosure sale. If the debtor overcomes the presumption, the deficiency shall be the total amount of the indebtedness prior to the sale plus the costs of the foreclosure and sale, less the fair market value of the property at the time of the sale as determined by the court.

* * * * *

## Tenn. Code. Ann. § 47-9-604. Procedure if Security Agreement Covers Real Property or Fixtures

(a) ENFORCEMENT: PERSONAL AND REAL PROPERTY. If a security agreement covers both personal and real property, a secured party may proceed:

> (1) under this part as to the personal property without prejudicing any rights with respect to the real property; or

> (2) as to both the personal property and the real property in accordance with the rights with respect to the real property, in which case the other provisions of this part do not apply.

(b) ENFORCEMENT:FIXTURES. Subject to subsection (c), if a security agreement covers goods that are or become fixtures, a secured party may proceed:

> (1) under this part; or

> (2) in accordance with the rights with respect to real property, in which case the other provisions of this part do not apply.

* * * * *

**Tenn. Code. Ann. § 47-9-610. Disposition of Collateral After Default**

. . .

(b) COMMERCIALLY REASONABLE DISPOSITION. Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one(1) or more contracts, as a unit or in parcels, and at any time and place and on any terms.

\* \* \* \* \*

**Tenn. Code. Ann. § 47-9-615. Application of Proceeds of Disposition; Liability for Deficiency and Right to Surplus**

. . .

(d) SURPLUS OR DEFICIENCY IF OBLIGATION SECURED. If the security interest under which a disposition is made secures payment or performance of an obligation, after making the payments and applications required by subsection (a) and permitted by subsection (c):

    (1) unless subdivision (a)(4) requires the secured party to apply or pay over cash proceeds to a consignor, the secured party shall account to and pay a debtor for any surplus; and

    (2) the obligor is liable for any deficiency.

(e) NO SURPLUS OR DEFICIENCY IN SALES OF CERTAIN RIGHTS TO PAYMENT. If the underlying transaction is a sale of accounts, chattel paper, payment intangibles, or promissory notes:

    (1) the debtor is not entitled to any surplus; and

    (2) the obligor is not liable for any deficiency.

(f) CALCULATION OF SURPLUS OR DEFICIENCY IN DISPOSITION TO PERSON RELATED TO SECURED PARTY. The surplus or deficiency following a disposition is calculated based on the amount of proceeds that would have been realized in a disposition complying with this part to a transferee other than the secured party, a person related to the secured party, or a secondary obligor if:

    (1) the transferee in the disposition is the secured party, a person related to the secured party, or a secondary obligor; and

    (2) the amount of proceeds of the disposition is significantly below the range of proceeds that a complying disposition to a person other than the secured party, a person related to the secured party, or a secondary obligor would have brought.

. . .

# UNIFORM COMMERCIAL CODE COMMENT

. . .

**6. Certain "Low-Price" Dispositions.** Subsection (f) provides a special method for calculating a deficiency or surplus when the secured party, a person related to the secured party (defined in Section 9-102), or a secondary obligor acquires the collateral at a foreclosure disposition. It recognizes that when the foreclosing secured party or a related party is the transferee of the collateral, the secured party sometimes lacks the incentive to maximize the proceeds of disposition. As a consequence, the disposition may comply with the procedural requirements of this Article (e.g., it is conducted in a commercially reasonable manner following reasonable notice) but nevertheless fetch a low price.

Subsection (f) adjusts for this lack of incentive. If the proceeds of a disposition of collateral to a secured party, a person related to the secured party, or a secondary obligor are "significantly below the range of proceeds that a complying disposition to a person other than the secured party, a person related to the secured party, or a secondary obligor would have brought," then instead of calculating a deficiency (or surplus) based on the actual net proceeds, the calculation is based upon the amount that would have been received in a commercially reasonable disposition to a person other than the secured party, a person related to the secured party, or a secondary obligor. Subsection (f) thus rejects the view that the secured party's receipt of such a price necessarily constitutes noncompliance with Part 6. However, such a price may suggest the need for greater judicial scrutiny. See Section 9-610, Comment 10.

\* \* \* \* \*

### Tenn. Code. Ann. § 47-9-626. Action in Which Deficiency or Surplus is in Issue

In an action arising from a transaction in which the amount of a deficiency or surplus is in issue, the following rules apply:

(1) A secured party need not prove compliance with the provisions of this part relating to collection, enforcement, disposition, or acceptance unless the debtor or a secondary obligor places the secured party's compliance in issue.

(2) If the secured party's compliance is placed in issue, the secured party has the burden of establishing that the collection, enforcement, disposition, or acceptance was conducted in accordance with this part.

(3) Except as otherwise provided in § 47-9-628, if a secured party fails to prove that the collection, enforcement, disposition, or acceptance was conducted in accordance with this part relating to collection, enforcement, disposition, or acceptance, the liability of a debtor or a secondary obligor for a deficiency is limited to an amount by which the sum of the secured obligation, expenses, and attorney's fees exceeds the greater of:

(A) the proceeds of the collection, enforcement, disposition, or acceptance; or

(B) the amount of proceeds that would have been realized had the noncomplying secured party proceeded in accordance with this part relating to collection, enforcement, disposition, or acceptance.

(4) For purposes of paragraph (3)(B), the amount of proceeds that would have been realized is equal to the sum of the secured obligation, expenses, and attorney's fees unless the secured party proves that the amount is less than that sum.

\* \* \* \* \*

**Tenn. Code. Ann. § 47-9-627. Determination of Whether Conduct was Commercially Reasonable**

. . .

(b) DISPOSITIONS THAT ARE COMMERCIALLY REASONABLE. A disposition of collateral is made in a commercially reasonable manner if the disposition is made:

(1) in the usual manner on any recognized market;

(2) at the price current in any recognized market at the time of the disposition; or

(3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.

* * * * *